𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

DEARING, ET ALS., V. DEARING, ET ALS.

March 16, 1922.

1. DEMURRER TO THE EVIDENCE—*General Rule.*—Upon demurrer to the evidence, if the evidence be such that a jury might have found a verdict for the demurree, the court must give judgment in his favor.

2. WILLS—*Evidence—Sufficiency of Evidence to Establish Will—Denial of Charge of Substitution.*—In the instant case, a contest of a will, one of the attesting witnesses testified as to the due execution of the will, that it was written on two sheets of paper, and that the will shown in court was the same paper testator said was his will. The other subscribing witness was dead.

*Held:* That while it is generally true that a will cannot be established upon the uncorroborated testimony of a non-attesting witness, yet in the instant case, the will having been proven by one of the attesting witnesses, the testimony of the executor of the will in denial of the charge that he had supplied the first sheet of the will, after it was signed by the testator, should be considered in corroboration of the testimony of such attesting witness, and in determining the genuineness of the will.

3. WILLS—*Will Written on More than One Sheet of Paper—Signatures.*—While it is the better practice where a will is written on more than one sheet of paper to have the testator sign each sheet, yet this is not necessary to the validity of the will. Nor does the law require attesting witnesses to sign each sheet.

4. WILLS—*Knowledge of Attesting Witnesses of Contents.*—The law does not require witnesses to acquaint themselves with the contents of a will before signing the same.

5. WILLS—*Probate—Evidence Sufficient to Admit Paper to Record.— Case at Bar.*—In the instant case the evidence of one of the attesting witnesses, when considered with the other facts shown in evidence, and with the record of the probate of the will before the circuit court, upon the testimony of the other subscribing witness, left no room for doubt that the paper writing in question was, in all respects, the paper writing signed by the testator and by the attesting witnesses, and the proponents, in the absence of evidence to the contrary, were entitled to have the

writing admitted to record as and for the last true will and testament of the deceased.

6. WILLS—*Several Sheets of Paper.*—A will need not be written entirely on one sheet of paper, provided that the sheets are so connected together that they may be identified as parts of the same will.

7. WILLS—*Undue Influence—Facts not Sufficient to Give Rise to the Presumption of Undue Influence—Case at Bar.*—In the instant case contestants offered no direct evidence of undue influence and it was held that undue influence would not be inferred from the facts that testator was denied visitors upon the instruction of his physician, that the will was privately executed and witnessed by members of the executor's household, and that no lawyer wrote the will or was consulted about it—the testamentary capacity of the testator, and that he was not easily susceptible to influence, being shown by the uncontradicted testimony of a number of witnesses.

8. UNDUE INFLUENCE—*What Constitutes.*—Before undue influence can be made the ground for setting aside a deed or will, it must be sufficient to destroy free agency on the part of the grantor or the testator; it must amount to coercion—practically duress. It must be shown to the satisfaction of the court that the party had no free will, but stood *in vinculis.*

9. UNDUE INFLUENCE—*Burden of Proof.*—The burden of proof, as in a case where fraud is charged, is always on him who charges undue influence.

10. UNDUE INFLUENCE—*Presumption—Not Easily Inferred.*—It is accepted as the law in all jurisdictions that forgery, undue influence and fraud in obtaining the testator's signature to a different instrument from that which he intended to sign, are offenses too grave to be lightly inferred from circumstances which are capable of innocent construction.

11. WILLS—*Genuineness—Declarations of Testator.*—The declarations of the alleged testator, standing alone, are inadmissible as direct evidence to prove or disprove the genuineness of a will; but where the genuineness of the will has been assailed by other proper evidence, the declarations are admissible as circumstances, either to strengthen or to weaken the assault, according to their inconsistency or harmony with the existence or terms of the will.

Appeal from a decree of the Circuit Court of Rappahannock county. Decree for defendants. Complainants appeal.

*Affirmed.*

The opinion states the case.

*Volney E. Howard, H. C. Featherston* and *Chas. H. Keyser*, for the appellants.

*Aubrey G. Weaver*, for the appellees.

WEST, J., delivered the opinion of the court.

This suit involves a contest over the will of Alfred Willis Dearing, who died in Rappahannock county, Va., on September 9, 1916, in his eighty-ninth year, unmarried and without issue, leaving an estate valued at more than a half-million dollars.

His heirs at law are, the contestants, R. Alvin Dearing, William A. Dearing and Janie E. Dearing, nephews and niece, and Robert Scott Dearing, a grandnephew, and his five nephews and five nieces, to-wit: Eugenia Dearing, Alice Dearing, Eva Calloway and John Dearing, of Georgia; Alfred E. Dearing, of Tennessee; Eugenia Cox, of Amherst, Va.; J. A. Dearing, of Shenandoah Junction, W. Va.; W. G. Dearing, Eastham Dearing and Annie M. Dearing, of Rappahannock county, Va., the last ten of whom are named as sole devisees in the will.

On September 11, 1916, J. Alfred Dearing, a nephew, and the executor named in the will, produced the same in Rappahannock Circuit Court, and being proved by the testimony of Miss P. M. Dearing, one of the subscribing witnesses thereto, who also proved the due attestation of said will by J. C. Walter, the other subscribing witness thereto (the said J. C. Walter being unable to attend court and testify on account of sickness), the said paper writing was ordered to be recorded as and for the last will and testament of the said A. W. Dearing, deceased; and the said J. Alfred Dearing qualified as executor and took possession of the estate.

Subsequently, the contestants instituted a suit ·in· chancery, attacking the validity of this will, and an issue *devisavit vel non* was directed therein, in which the defendants in the chancery suit were made plaintiffs and the plaintiffs therein (the contestants) were made defendants. There were three trials of this issue before three separate juries. Each of the first two trials resulted in a hung jury, and on the third trial the plaintiffs · (the propounders of the will) demurred to the evidence and the jury found against the will, subject to the decision of the court on the demurrer to the evidence. The court sustained the demurrer to the evidence and entered judgment accordingly, and also entered a decree establishing said paper writing as the last true will and testament of the said A. W. Dearing; and this is the judgment and decree complained of.

On the trial of the issue of *devisavit vel non*, the contestants filed the following grounds of defense:

1. They deny ·that the typewritten instrument, bearing date on May 29, 1916, signed with the name of A. W. Dearing and admitted to probate in the Circuit Court of Rappahannock county on September 11, 1916, is the true last will and testament of the said A. W. Dearing, and they require strict proof thereof.

2. The said alleged will was not properly and legally executed and attested.

3. The said alleged will was procured by fraud and undue influence on the part of J. A. Dearing, named in said instrument as executor, aided by members of the household wherein the said A. W. Dearing died.

[1] The evidence will be considered under the rule applicable to a demurrer to the evidence, this rule being that if the evidence be such that a jury *might* have found a verdict for the demurree, the court *must* give judgment in his favor. Burk's Pl. & Pr., p. 495, sec. 263.

[2] Has the will been proven in the manner prescribed by law?

J. C. Walter, one of the attesting witnesses, testified substantially as follows: That he resided at Huntley, and was not related to A. W. Dearing; that he was informed by J. A. Dearing that A. W. Dearing wished to see him in his room; that when he entered the room, A. W. Dearing was standing in the floor with the paper in his hand, and said: "This is my will, and I want you and Cousin Pat (Miss P. M. Dearing) to sign it"; that A. W. Dearing signed the will in the presence of both witnesses, and they signed it as witnesses in his presence, all three being present together at the same time; that testator directed witnesses where to sign, and was of sound mind at the time; that the will was written on two sheets of paper, and that the will shown witness in court was the same paper testator said was his will; that witness did not read the will or know what it contained; that P. M. Dearing, the other subscribing witness, was dead.

While it is generally true that a will cannot be established upon the uncorroborated testimony of a non-attesting witness, yet in the instant case, the will having been proven by one of the attesting witnesses, the testimony of J. Alfred Dearing, in denial of the charge that he had supplied the first sheet of the will, after it was signed by the testator, should be considered in corroboration of the testimony of such attesting witness, and in determining the genuineness of the will.

The circuit court had before it the will, the same being also filed with the record here, which is written upon two sheets of paper fastened together by two clamps, a small one made of thin brass and the other of steel. The uncontradicted evidence of J. A. Dearing is that the latter was put on by Mr. Weaver, in the office of Downing & Weaver, at the time the will was sent to them for inspection; that the first sheet was attached to the second when the testator signed the will, and that the will was afterwards re-

turned to the testator and remained in his possession for several weeks.

[3, 4] While it is the better practice where a will is written on more than one sheet of paper to have the testator sign each sheet, yet this is not necessary to the validity of the will. Nor does the law require attesting witnesses to sign each sheet or acquaint themselves with the contents of a will before signing the same.

[5] The testimony of the witness Walter bears the impress of truth, and when considered with the other facts shown in evidence, as above stated, and with the record of the probating of the will before the circuit court, upon the testimony of Miss P. M. Dearing, the other subscribing witness, leaves no room for doubt that the paper writing shown the witness is, in all respects, the paper writing signed by the testator and by said Walter and P. M. Dearing as attesting witnesses, and that the proponents, in the absence of evidence to the contrary, were entitled to have the said writing admitted to record as and for the last true will and testament of A. W. Dearing, deceased.

In *Palmer* v. *Owen,* 229 Ill. 115, 82 N. E. 275, it is said: "It is well established that a will may be made up of several sheets of paper, and they need not be fastened together." *Wykoff's Appeals,* 15 Pa. 291, 53 Am. Dec. 597; *Barnewall* v. *Murrell,* 108 Ala. 366, 18 So. 831; *Ela* v. *Edwards,* 16 Gray (Mass.) 91; *Harp* v. *Parr,* 168 Ill. 469, 48 N. E. 113.

In *Young* v. *Barner,* 27 Gratt. (68 Va.), at p. 106, this court said: "If the witnesses to the will are dead, or if there is a failure of recollection on their part, the court will often presume (the will being in other respects regular) that the requirements of the statute have been complied with in the formal execution of the instrument. Such presumptions are absolutely essential to the protection of property and the security of titles. Were it otherwise, the most important and solemn instruments would often fail to take

effect by the death, or from the mere failure of attesting witnesses (real or assumed) to recall each and every formality presented for the execution of testamentary papers."

In *Palmer* v. *Owen, supra,* it is also said: "Counsel for appellants say the sheets upon which the will was written were not all uniform in texture and finish, and from these circumstances, and the further fact that the witnesses to the will were unable to identify every sheet of it as being the same paper the testator signed and they witnessed as his will, it is contended probate should have been denied because they say the proof does not show that the instrument sought to be probated is the whole instrument acknowledged and executed by the testator as his will. It is true, as counsel contended, that it is possible where a will is written on separate sheets of paper, loosely fastened together, that one or more sheets might be removed and others substituted, but the possibility of this being done is not sufficient to justify denying the admission of a will to probate. It is not necessary to the validity of a will that it should be all written on one sheet of paper. All that is required is that the whole will shall be in the presence of the witnesses when attested by them. *Harp* v. *Parr,* 168 Ill. 459, 48 N. E. 113. Neither is it required that the witnesses to a will should read it or examine it with such care as to be able, upon application to admit to probate, to say that all the pages or clauses of the proposed will were the pages and clauses signed by the testator and attested by them."

In Page on Wills, at section 372, the author says: "In view of the principles already laid down, it is evident that the forgetfulness of the accessible subscribing witness, as to certain necessary facts of execution, does not avoid a *prima facie* case made out by proof of the genuineness of the signature of the testator and the subscribing witnesses.

So, where the subscribing witnesses identify their signatures, but have no recollection of having attested the instrument, or the circumstances of execution, the presumption that it was properly executed will uphold it in the absence of clear and satisfactory proof to the contrary."

In 40 Cyc. 1093, it is said: "A will need not be written entirely on one sheet of paper, but may be written on several sheets, provided that the sheets are so connected together that they may be identified as parts of the same will. Connection by the meaning and coherence of the subject matter is sufficient, as physical attachment by mechanical, chemical or other means, is not required, although sufficient when made."

[7] The proponents having made out a *prima facie* case, the contestants seek to defeat the will by proving it was procured by fraud and undue influence. They offer no direct evidence, but rely solely upon circumstances, inferences and presumptions. Among the circumstances on which they rely may be mentioned the following:

(a) That the testator was taken to Huntley and denied visitors.

A. W. Dearing was never married, and lived alone in Rappahannock county, and the Huntley home was the only other Dearing home in the county. When he was taken with his final illness, his friend, Joseph Reid, advised him to go to Huntley, and he finally consented and went.

His attending physician, Dr. Kipps, gave instructions to keep him quiet and not allow him to have company, and says he is responsible for the action of the nurse in refusing admittance to visitors. While these instructions were in force, several of his friends called but were not permitted to see him. Later, when his condition was improved, several of them were allowed to see him. There was nothing unusual in the course pursued by the attending physician in his case.

(b) That the will was privately executed and witnessed by members of the Huntley household.

A. W. Dearing had accumulated a very large estate, and, like most successful business men, preferred to keep his business, as far as possible, from the public, and executed his will in the presence of a few friends, as most people do. When it was suggested that one Mattox be called to witness his will he objected, stating that he did not want the impression to get out that he was about to die. It is a tribute to the honesty and integrity of the members of the household at Huntley, against whom the charge of fraud has been hurled by the contestants, that not one of them will receive, under the terms of the will, one dollar more than their cousins in Georgia. In fact, the heirs of John Dearing residing in Georgia and Tennessee receive exactly one-half of the entire estate, while J. A. Dearing and his two sisters receive less than one-third.

(c) That no lawyer wrote the will, or was consulted about it, and that J. A. Dearing was the draftsman, beneficiary and executor.

Comparatively few people employ lawyers to write their wills, and it is not surprising that a man of A. W. Dearing's business sagacity and disposition to economize should have pursued this course. He did, however, after it was executed, submit the will to Downing & Weaver for their approval.

John H. Jenning, a disinterested witness, testified that he had known the testator for a long time and had transacted much business with him; that in 1915 he spent the night in his home and something was said about Downing & Weaver, and the witness said: "I reckon they will settle up your estate after you are gone; they know a good deal about your business," and he said: "No, there is a man who knows a good deal more about it than they do," and he said it was his nephew, and witness asked which one, and

he said, "the one that was at Shenandoah Junction; that
gentleman over there at your right."

John M. Johnson, who has no interest in this suit, testi-
fied that Mr. Dearing was an old friend of his and spent
the night at his home about two years before his death, as
he often did, and he got to quizzing him as to who would be
his administrator, and said to him, "Mr. Downing and Mr.
Weaver will administer your estate," and he said, "No, I
think there is brains enough in the Dearing family to ad-
minister it," and indicated that he preferred Mr. Alfred
Dearing, on account of his health, as he was delicate and
was competent.

It is true that J. Alfred Dearing is a beneficiary under
the will, but if, as charged by the contestants, he has per-
petrated a fraud on his testator by supplying the first sheet
of paper constituting the will, after it was signed by the
testator, it seems strange indeed that he did not make a
larger provision for himself and sisters instead of provid-
ing that they receive one-tenth each, the same received by
each of the other devisees. The contestants admit the gen-
uineness of the second sheet, and it is on this that he is
named as executor. It is unbelievable that a man would
commit a forgery when no advantage could thereby accrue
to him or his people.

The case of *Coffin* v. *Coffin*, 23 N. Y. 9, 80 Am. Dec. 235,
is parallel with the case at bar. At page 13 of 23 N. Y.,
at page 238 of 80 Am. Dec., the court says: "The cir-
cumstances that the nephew, who prepared the will, was
appointed one of the executors and is also one of the
legatees, has been urged upon our consideration. Facts of
this kind may, and do often, very justly excite the suspicion
of courts when fraud and undue influence are alleged; but
it is not a rule or principle in the law of testaments that
the draftsman of a will cannot be an executor, or cannot
take a benefit under it. As men quite generally appoint

some of their kindred to be their executors, the choice in the instance before us does not seem to be an unnatural one. · Indeed, there would be some difficulty in suggesting a different choice in the actual circumstances and relations of the testator. In respect to the legacy or portion given to A. H. Coffin, the draftsman of this will, we find it so moderate in amount, and in such just proportion to the sums given to the nine other persons standing in the same relation to the testator, as to afford no ground for invalidating the instrument or any part of it. As I have observed, there is no rule of law which prevents a person who prepares a will from taking a legacy under it. In the language of Baron Parke, in *Butlin* v. *Barry*, 1 Curt. Ecc. 637, 'All that can be truly said is, that if a person, whether an attorney or not, prepare a will with a legacy to himself, it is at most a suspicious circumstance of more or less weight, according to the facts of each particular case; in some, of no weight at all, as in the case suggested varying according to circumstances; for instance, the *quantum* of the legacy, the portion it bears to the property disposed of, and numerous other contingencies.' "

The testamentary capacity of the testator being shown by the uncontradicted testimony of a number of witnesses, including three physicians, the inquiry is as to his mental make up. Was he easily influenced by others? On this point, the witnesses, with one accord, testified that he was a man of strong purpose of mind, did his own thinking, and was not easily susceptible to influence from others.

[8, 9] The law as to what constitutes undue influence has been very clearly stated in *Wood* v. *Wood,* 109 Va. 470, 63 S. E. 994, where Harrison, J., speaking for this court, says: "Before undue influence can be made the ground for setting aside a deed or will, it must be sufficient to destroy free agency on the part of the grantor or the testator; it must amount to coercion—practically duress. It must be

shown to the satisfaction of the court that the party had no free will, but stood *in vinculis;* and the burden of proof in such a case, as in a case where fraud is charged, is always on him who charges undue influence."

On the question of undue influence, Schouler on Wills (5th ed.), sec. 239, reads as follows: "As to undue influence in the usual and less offensive sense, the burden of proving affirmatively that it operated upon the will in question lies still on the party who alleges it, either by direct proof or circumstances inconsistent with fair dealing. * * * 'In order to set aside the will of a person of sound mind,' observes Lord Cranworth, 'it is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence; it must be shown that they are inconsistent with a contrary hypothesis.'

"Hence, it is that isolated and disconnected circumstances are not permitted to outweigh the usual presumption that a person of intelligence and capacity who executes a will does so without imposition or undue influence. Thus the simple fact that the later will modifies an earlier one in favor of one who drew it up is held insufficient to overcome such a presumption, or generally that the testator's draftsman, or one whose advice was sought by him, was made executor or receives a legacy under the will."

[10] It is accepted as the law in all jurisdictions that forgery, undue influence and fraud in obtaining the testator's signature to a different instrument from that which he intended to sign, are offenses too grave to be lightly inferred from circumstances which are capable of innocent construction.

There was introduced in evidence a paper writing designated as the "pencil will," dated January 14, 1914, written and signed by A. W. Dearing, in pencil, whereby all of his bonds, notes and evidences of money due him were assigned

to A. E. Dearing and J. A. Dearing, trustees, for the purpose of an equal distribution "between my five nieces and my five nephews."

The uncontradicted testimony of J. A. Dearing is to the effect that A. W. Dearing asked him to come to his home, witness thought to look over some bonds. When he arrived, A. W. Dearing showed him the pencil-written will and said that was the way he wanted his property to go, but he was going to eliminate Alfred E. Dearing as executor, because he had shown himself unfit to handle his own money, and he could not handle his; and testator handed him the pencil will and said, "Put it in type." J. A. Dearing took the pencil will home with him and returned later with the will he had prepared, which is the will dated May 29, 1916, which was signed by the testator. When this will was executed, A. W. Dearing destroyed the pencil paper, handing the fragments to J. A. Dearing rather than throwing them on the floor. The latter advised him not to destroy the pencil paper, as it was his own handwriting and showed his desire in the distribution of his estate. J. A. Dearing kept the fragments and later pasted them together on another piece of paper. The witness is under the impression that the pencil paper included the real estate, and from an inspection of this paper it appears there is ample vacant space caused by the missing pieces of paper to include the word "lands." This paper shows that it was A. W. Dearing's intention to give all his property to his five nieces and five nephews. And Mrs. Eva Calloway, daughter of John Dearing, deceased, of Athens, Ga., testified that she visited her uncle, A. W. Dearing, in 1908, and he told her that W. A. Dearing, of Amherst, the father of the contestants, was the only one of his relatives who had ever "used profanity towards him," adding that *his* children would never receive any of his property. Mrs. Calloway also testified that she visited A. W. Dearing about one month before his death,

and says: "He told me he had spent considerable thought upon the disposition of his land; that he at first considered leaving the land to his five nieces and nephews who live in Virginia, and making up—of course, I don't remember his exact words—making up the difference in the value of the land to the Georgia Dearings in money, or giving the value of the land to the Georgia Dearings in money; then he said, 'but I finally decided to divide the land equally between my ten nieces and nephews, and then you can do as you please with it.' "

She also testified that he said to her: "I have divided my property equally among my ten nieces and nephews; when you go home, tell your brothers and sisters what I have done."

[11] The contestants also rely on certain declarations of the testator made before the date of the will, and many of them several years before, to the effect that the law made a good will or a better will than he could make. Such evidence can have little, if any, weight in the determination of the matter at issue here, as the contestants admit that a will was made, but claim that the first sheet of the will is a forgery.

In the case of *Samuel* v. *Hunter's Ex'r*, in which the declarations were made after the will was executed, this court, speaking through Kelly, P., said: "The authorities are not in accord on the subject, but we are of the opinion that the rule supported by the better reason and authority is that such declarations, standing alone, are not admissible as direct evidence to prove or disprove the genuineness of the will; but that in all cases where its genuineness has been assailed by other proper evidence, the declarations are admissible as circumstances, either to strengthen or to weaken the assault, according to their inconsistency or harmony with the existence or terms of the will. This is the settled rule in England and is well supported by authority

in this country." *Samuel* v. *Hunter's Ex'r,* 122 Va. 636, 95 S. E. 399.

J. Alfred Dearing, the executor, was evidently held in high regard by his uncle, the testator, as the latter frequently sent for him to come to his home and list his notes and bonds, and the uncle's books showed numerous entries in Alfred's handwriting. The selection of this nephew to keep his books and act as executor of his will was but natural, as J. Alfred Dearing was a man of education—a graduate of the V. M. I., at the head of his class, and winner of the Jackson-Hope medal. To his credit, the contestants have failed to produce any evidence which reflects upon his character or his integrity.

A careful examination of the evidence reveals nothing which would warrant a jury in finding that the paper writing bearing date on May 29, 1916, shown in evidence, is not the true last will and testament of A. W. Dearing, deceased.

The judgment of the circuit court sustaining the demurrer to the evidence and its decree establishing said will are plainly right, and will be affirmed.

*Affirmed.*