# Richmond.

## P. P. AND ELLA O. JENKINS v. JOHN ANDERSON TRICE ET ALS.

March 21, 1929.

412

The opinion states the case.

*M. J. Fulton, Tazewell Buchanan* and *Lionel Moses,* for the plaintiffs in error.

*Leake & Spicer, Leake & Buford, Henry C. Riely,* and *Thos. L. Preston,* for the defendants in error.

Holt, J., delivered the opinion of the court.

The purpose of this litigation is to ascertain and determine what is the last will and testament of Frank B. Jenkins, deceased.

Decedent was born at Columbia, Virginia, and moved with his parents to Richmond in 1896, where he sold shoes, in which vocation he continued so long as he continued in business. The latter part of his active life was spent in Florida, where he suffered a nervous breakdown, was forced into permanent retirement and returned to Virginia to his parents' home in March, 1925. On July 17, 1926, by the advice of his physician, he went to Columbia to recuperate and remained there, without profit to his health, until August 4, when he returned to Richmond, where he died August 28, in the 54th year of his age. The will in judgment was executed in Columbia on July 29, 1926.

About twenty years preceding his death, he was stricken with typhoid fever, after which he began to drink, although not to an extent which interfered with his work until a short time before he returned to Virginia. He accumulated a considerable estate, amounting to $55,000.00 or $60,000.00, and left to survive him his father, his mother, an elderly uncle, an aunt and forty-seven first cousins.

His first will was executed on June 30, 1912. In it he gave all of his property to his father and mother in equal shares, appointed them his executors, and requested that they be permitted to qualify as such without security on their executorial bond. Both wills were offered for probate. This is a copy of the second:

"I, Frank B. Jenkins, of the city of Richmond, Virginia, being of sound and disposing mind and memory, do make, publish and declare this to be my last will and

testament, hereby revoking all wills made by me at any time heretofore made.

"FIRST: I desire that all my just debts and funeral expenses be paid by my executors hereinafter named as soon after my death as possible.

"SECOND: My will and desire is, and I so devise and bequeath, that my estate be kept together until the death of my father and mother, and out of the interest and profits of my estate my executors shall annually pay to my beloved father and mother during their lives and during the life of the survivor of them, the sum of twenty-five hundred ($2,500.00) dollars— that is to say, $2,500.00 to them jointly during their joint lives, and then at the death of either of them the same sum of $2,500.00 to the survivor during his or her life. After the death of my father and mother, I desire my estate as it then is, to be disposed of as follows:

"To Vernon Harris, wife of George Harris, Richmond, Virginia, and to Ada Trice, Fannie Trice and Lois Trice, daughters of R. A. Trice, deceased, of Goochland county, the sum of TWO THOUSAND ($2,000.00) Dollars, each; to Stella Cantrell, widow of P. L. Cantrell, decd., and Daisy Pace and Willie McEwing (said Willie McEwing is the daughter of late Wm. Trice and Daisy Pace daughter of Henry H. Pace) the sum of ONE THOUSAND ($1,000.00) Dollars each; to Charles F. Harris, of Richmond, Virginia, the sum of TWO HUNDRED AND FIFTY ($250.00); to my aunt Bettie Trice, and to Jennie Trice and Ella Haden (wife of P. H. Haden) all of Goochland county, Virginia, the sum of FIVE HUNDRED ($500.00) each; to Lena Trice, wife of John Anderson Trice, the sum of ONE THOUSAND ($1,000.00); to John Lester, of Martinsville, Virginia, the

sum of ONE HUNDRED (100.00) Dollars; to W. M. Wash, Richmond, Virginia, the sum of ONE HUNDRED ($100.00); to Pattie T. Turner, wife of Geo. H. Turner, of Louisa, Virginia, the sum of TWO HUNDRED AND FIFTY ($250.00) Dollars; to Irving S. Wood, of Columbia, Virginia, the sum of TWO HUNDRED ($200.00) Dollars; to A. B. Snead, Richmond, Virginia, the sum of ONE HUNDRED ($100.00) Dollars; and to Mrs. Lucy Trice, widow of Judge J. M. Trice, decd., the sum of TWO HUNDRED ($200.00) DOLLARS.

"To the above named Fannie Trice, I give my diamond ring; to the above named Ada Trice, I give my motor car; to the above named Lois Trice the diamond ring which was my mother's. Of the debt owing to me by Richard Carter, of Goochland county, I desire that my executors collect of him only half of the amount due at the time of my death—the other half being abated to him.

"After all debts, funeral expenses and costs of administration, and all of the above mentioned specific legacies are fully paid, all the rest, residue and remainder of my estate, I give, devise and bequeath as follows, to-wit:

"One-fifth (1–5) part thereof to the Baptist Church (white) at Columbia, Virginia, and the balance of my said estate, after deducting the said 1–5 part, is to be equally divided between the Baptist Orphanage, at Salem, Virginia, Home for Incurables, Richmond, Virginia, and Grove Avenue Baptist Church, Richmond, Virginia.

"I hereby nominate and appoint John Anderson Trice, of East Leake, Virginia, and the First and Merchants National Bank and Trust Company, Richmond, Virginia, executors of this my last will and

testament and request that no security be required of either of them on their qualification as such.

"Given under my hand and seal this 29th day of July, 1926.

"Frank B. Jenkins (Seal)

"The above signature of Frank B. Jenkins, the testator above named, was made and the foregoing will was acknowledged to be his last will and testament by the said testator in the presence of us, three competent witnesses, present at the same time; and we the said three witnesses do hereunto subscribe the said will on the date last above written, in the presence of the said Frank B. Jenkins, the testator, and of each other, at the request of the said testator, who was then of sound mind and over the age of twenty-one years.

"George H. Huskstep.

D. M. Pitts.

G. A. Hodgson."

These proceedings involve an issue of *devisavit vel non,* and were had under the provisions of section 5253 *et seq.* of the Code of Virginia. All parties interested were duly summoned. At the hearing the beneficiaries under the second will, other than P. P. Jenkins and L. O. Jenkins, were designated as plaintiffs. To this objection was made and overruled, thereupon P. P. and L. O. Jenkins moved the court to amend its order to show that Stella Cantrell, Willie McEwen, Ella Haden, Bettie A. Trice, Charles F. Harris, W. M. Wash, Richard Carter and the trustees of the First Baptist of Columbia were not asking for the probate of the last will. This the court overruled also, but allowed them to file as a part of the record a typewritten letter containing such a request, signed by all of those named except by the trustees of the First Baptist Church of Columbia.

In due course this issue was made up and submitted
to a jury: "Whether or not a certain paper writing,
dated January 30th, 1912, or a certain paper writing
dated July 29, 1926, either, or both, or any part of
either or both, constitute the last will and testament of
Frank B. Jenkins, deceased."

After a hearing which extended over several days,
this verdict was returned into the court: "We the
jury on the issue joined, find that the paper writing,
bearing date of the 29th day of July, 1926, is the true
last will and testament of Frank B. Jenkins, deceased.
W. Creed Davis, Foreman."

It was confirmed by the trial court, and the propriety
of that confirmation is before us on a writ of error.

The insufficiency of the evidence, undue influence,
improper admission and rejection of testimony and
errors of law in instructions given and rejected, are
all relied upon, but in the main the contest turns upon
the sufficiency of the evidence and undue influence.

Six physicians have testified that in their opinion
Jenkins was of unsound mind and incapable of making
a will. They are Dr. J. J. Anderson, Dr. George H.
Snead, Dr. A. L. Gray, Dr. E. J. Moseley, Dr. J. J.
Nelson and Dr. J. M. Hutcheson.

Dr. Anderson, who had known him for many years,
was summoned as attending physician and found him
suffering from alcoholic neuritis. Every effort to sober
him up failed. He tried repeatedly, without success,
to induce him to go to a sanatorium, as did other
physicians. During a great part of this time he suf-
fered from *delirium tremens*, and throughout the months
of February, March and April, 1926, and afterwards,
grew progressively worse from uncontrolled indulgence
in alcoholic stimulants. His mind became affected;
he suffered from impairment of speech; there was a

thickening of the tongue and lips, which made articulation difficult. There was no continuity of mental processes. He was under the mistaken impression that he could not move his limbs, complained of neuritis in different parts of the body, imagined he had tuberculosis and other afflictions, and thought that people were talking about him.

He lost control of the sphincter muscles and of his bowels and bladder, would urinate, etc., in bed. Could not remember when to take his medicine.

In short, this physician was of opinion that there was an uninterrupted progressive failure both physically and of mentally. His conclusion was that Jenkins suffered from softening of the brain, and his death certificate is to that effect, although no autopsy was made. He said that softening of the brain was attended by progressive degeneration of all of the intellectual faculties, and that in its progress there is no such thing, properly speaking, as a lucid interval.

Dr. Snead was also called in. He was slightly related to the testator and had known him for fifteen years. When called in the spring of 1926, he found him nervous and unable to sleep. He had a peculiar expression about his eyes, and could not give any connected history of his case or of the difficulties under which he labored. He was nervous, his muscles twitched and his hands shook. Whatever was suggested he would agree to. Dr. Snead's diagnosis and conclusions accord with those of Dr. Anderson.

Dr. Hutcheson had difficulty in getting from him any coherent statement of his troubles. His memory was poor and he had no continuity of thought. His diagnosis was: "My conclusion was that his nervousness and that sort of thing resulted from chronic alcoholism, and that he was incapable of looking after

himself—I mean, following out the instructions I would give him. My advice was that he be put in charge of some one who was equipped for managing such cases. I suggested a sanatorium. I understand that my suggestion was not followed."

Dr. Gray is an X-ray specialist and had known Jenkins from boyhood. He examined him on July 16–19, and in a general way restates the condition of the patient to be that set out in the preceding testimony. He was of opinion that the patient was on the verge of *delirium tremens*, but did not diagnose his trouble as softening of the brain.

Dr. Moseley was called in March and found him to be suffering from the prolonged effects of alcoholism and lack of nourishment; he had some symptoms of paresis. He was nervous, depressed, and a physical wreck. When asked if he had diagnosed the trouble as softening of the brain, he said "No." He further testified:

"Q. If he discontinued entirely the use of any liquor, would it be doubtful whether he would get any better?

"A. I think there had been so many inroads on his system that I doubt exceedingly whether he would get well.

"Q. Couldn't he get about by himself at that time?

"A. He walked to the front door that evening.

"Q. Could he go about the streets of the city of Richmond and make the impression on people that he was of sound mind?

"A. Yes, sir. There are many people walking the streets of Richmond today with much less mind than he had."

Dr. Nelson had known the testator for many years. He called to see him at Columbia and found his physical condition to be that heretofore detailed. His diagnosis

was softening of the brain or paresis, and while he recognized that his plight was bad, he did not think it to be as desperate as it was in fact, or that the end was so imminent. He also stated that he seemed to be cross and crabbed with his father and mother, an attitude entirely different from that theretofore manifested by lifelong affection.

Dr. Hall was called as an expert and testified that from the statements made, he was of opinion that there was softening of the brain and his evidence as to the character of that disease is in accord with Dr. Anderson's.

Nine lay witnesses also testified on behalf of plaintiffs. They were Miss Pace, Mrs. Carter, Mrs. Evans, Mrs. Cantrell, W. M. Wash, Mrs. Cowherd, H. S. Mosby, P. P. Jenkins and Mrs. Jenkins. They, in varying degrees, testified to the same physical facts. Some of them spoke of his delusions and some of his unnatural attitude towards his parents. They were of opinion that he did not have sufficient mind to remember his estate, who were the natural objects of his bounty and their claims upon him. In short, they were of opinion that he did not possess a mind sufficiently intelligent to make a will with sense and judgment.

. It is difficult to sum up this evidence in brief form, but all the witnesses concur in saying that Mr. Jenkins was a pitiful physical and nervous wreck, and that he, in the few months preceding his death, grew uninterruptedly worse.

Dr. Tucker was also examined as an expert. He did not think the testator suffered from softening of the brain, but from chronic alcoholism which does not make a man necessarily insane. From the statement of his case, as set out in hypothetical questions, he was of opinion that Jenkins had sufficient intelligence to re-

member his estate and to know what he wanted to do with it—that he could give it away with sense and judgment.

Mr. P. H. Miller was the draughtsman of the will. He is county clerk of Goochland county and has been in that office from forty-five to fifty years. His father, grandfather and great-grandfather have held it uninterruptedly since 1790. He was no ordinary lay witness. His evidence in part is:

"Q. From your observation of Mr. Jenkins at that time, and your experience with him as you have related, what would you say as to his mental capacity to make a will at that time?

"A. I saw no incapacity of mind. It did not impress me at all that he was not capable of making a will.

"Q. Did you feel confident that he was capable of making a will?

"A. I thought so.

"Q. Did he understand what he was doing?

"A. Absolutely, I thought.

"Q. Did he seem to know he was making a will?

"A. Certainly.

"Q. Did he seem to have comprehension of the property he was disposing of?

"A. He seemed to comprehend that he was making a will disposing of his estate, and he certainly seemed to know the persons to whom he was giving his estate, so far as I could see."

Its amount he estimated to be about $60,000.00.

A. J. Trice saw nothing to indicate mental unsoundness. Miss Fannie Trice, visiting the testator the day the will was executed, found nothing to indicate that he was not in his right mind. His sister, Lois, saw him in June (and in July at Columbia, where she went invited by his father), and Mrs. Mayo saw him in

July, and they saw no evidence of insanity; nor did the attesting witnesses who conferred on this subject immediately after the will was executed—a conference had because the suggestion was made to them that such a question might be raised.

- The physicians who attended him were men of character and intelligence, and great weight is to be attached to their opinion, but it is not conclusive. If we were bound by it, that would, of course, end the case, and it would be futile to offer testimony to controvert their conclusion. The evidence of Mr. Miller is more than ordinarily important. The necessities of his office and his long court experience made him familiar with wills and with their legal requirements. When the incompetency of Mr. Jenkins was suggested, he very properly answered that the court would have to decide that question.

The weight to be given to the testimony of subscribing witnesses is equally well settled.

In *Thornton* v. *Thornton's Ex'rs*, 141 Va. 232, 126 S. E. 69, this court, speaking through Prentis, J., said: "On the other hand, the testimony of the subscribing witness to the codicil, Mr. McIntyre, is clear, full and complete. He shows that the testator not only knew the contents of the original will and the first codicil; that he knew of his property; and that he knew of his children; and that he fully understood what he was doing. The testimony, unless overthrown, fully meets every requirement of the law for it is well settled that the testimony of the subscribing witness at the time of the act is entitled to peculiar weight. The other subscribing witness was called in from the street, had never seen the testator before, paid little attention to the transaction, and his testimony, while it fails to support the testator's capacity, is negative."

In *Forehand* v. *Sawyer, etc.*, 147 Va. 105, 136 S. E. 683, Judge Burks had occasion to consider the same subject, and there made this statement: "On the other hand, the testimony of those present at the *factum*—when the will is executed—is entitled to the greatest consideration. The time at which a will is executed is the vital time for mental capacity to exist. If it appears that the testator had mental capacity at that time, it is immaterial what his mental condition was before or after that time. Testimony on the subject of prior or subsequent incapacity is only relevant as tending to show incapacity at the time of execution. It is for this reason that so much importance is attached to the testimony of those who were present at the *factum*. Usually, this weight is attached to the testimony of the subscribing witnesses called by the testator, or with his assent, to witness the will, but if they had no previous acquaintance with the testator, were not selected by him, and nothing was said or done by him at the time to indicate his then mental condition, it is said that their testimony is not accorded the weight which would otherwise attach to it. *Tucker* v. *Sandidge*, 85 Va. 546, 8 S. E. 650; *Chappell* v. *Trent*, 90 Va. [849] 49, 19 S. E. 314."

In the case in judgment the attesting witnesses, after conference, deliberately reached the conclusion that the testator was competent to make a will.

That there was a conflict of evidence on this issue is manifest, made more so when we come to examine the will itself and the inherent reasonableness of its provisions.

The situation, when the will of 1912, was written, differed from that which confronted the testator in 1926. For the major part of the intervening fourteen years, he was in active business, and it is fair to assume

that his estate had materially increased. He was worth about $57,000.00 when he died, and had, in the meantime, supported his parents in comfort. In 1926 they were old and no longer vigorous. Their expectancy in the nature of things was short, the father being eighty-two years old, and the mother seventy-nine, and there was no occasion to do more than to provide for them during their remaining years. The $2,500.00 a year given, amounted in substance to a life estate. They had not manifested business capacity, for they had accumulated little, and in their extreme age were probably less competent than ever to manage successfully any considerable property. In such circumstances, it did not seem wise to the son to subject his fortune to the hazards of unskilled management, while the desire to control its ultimate disposition rather than to leave that to these old people is readily understandable. The provisions made, coupled with the small property which they owned, were ample to sustain them in modest comfort during the few remaining years of their lives. Nothing more was necessary for no one was dependent upon their bounty. These reasonable reasons, rather than any insane aversion, in all probability accounted for all that was done.

The issue so made was, under proper instructions, submitted to the jury, and their verdict is not only supported but is justified by the evidence.

Was there any undue influence exercised by John A. Trice?

He was given no legacy, but was appointed executor along with one of the leading trust companies of the State—that is to say, he was not left in control. Two thousand dollars each was given to his sisters, Ada, Fannie, Lois and Mrs. George Harris, and $1,000.00 to his wife. He and they were decedent's double first

cousins and his only double first cousins. His father has testified that his relations with them were very cordial and friendly, and he is the relative to whom the father turned during his son's long spree in the spring of 1926.

"Before undue influence can be made the ground for setting aside a deed, it must be sufficient to destroy free agency on the part of the grantor; it must amount to coercion—practically duress. Suggestion and advice addressed to the understanding and judgment do not constitute undue influence, nor does solicitations, unless the party be so worn by the importunities that his will gives way. Earnest entreaty, importunity and persuasion may be employed, but if the influence is not irresistible it is not undue, and its existence is immaterial, even though it is yielded to. *Greer* v. *Greer*, 9 Gratt. (50 Va.) 330, 333; *Orr* v. *Pennington*, 93 Va. 268, 24 S. E. 928; *Hammond* v. *Welton*, 106 Mich. 244, 64 N. W. 25; *Hamilton* v. *Smith*, 57 Ia. 15, 10 N. W. 276, 42 Am. Rep. 39. To set aside a deed for undue influence, it must be shown to the satisfaction of the court that the party had no free will but stood in *vinculis*. *Conley* v. *Nailor*, 118 U. S. 127, 6 Sup. Ct. 1001, 30 L. Ed. 112." *Jenkins* v. *Rhodes*, 106 Va. 569, 56 S. E. 334.

"Fraud and undue influence are never presumed. The burden of showing undue influence rests upon him who alleges it, and it cannot be based upon bare suggestion, innuendo, or suspicion. The undue influence which will vitiate a will must be of such character as to control the mind and direct the action of the testator." *Core* v. *Core's Adm'rs*, 139 Va. 1, 124 S. E. 453.

This proposition is too well settled to merit further discussion. Fraud and undue influence are not

to be presumed but must be proven by evidence clear, cogent and convincing. The burden of proof is upon him who makes the charge.

How did Trice come to be with decedent during his last illness, and what opportunities did he have for superimposing upon him his own will?

The father who makes the charge has himself answered. He came to see him in February, 1926. It was then that the son was on a protracted spree. A short time after this visit, the father sent for him "to come down and help sober him up."

"He came; he slept with him and treated him as nice as anybody could do, and he seemed to do all he could for him. He spent about three or four days, and then he had to go home and after he left, he took to drink again but not as bad as he was before."

He next came on July 26th, when the son had gone to Columbia. This visit was in answer to a request, delivered through Mr. Cowherd, who said: "Joe, Frank says come to Columbia, that he wants to see you on business." He did come and it was on this occasion that the father said to him "Frank is mighty flighty." Trice returned the next day and brought with him Mr. Miller. He returned upon the 29th and brought with him the subscribing witnesses. Some time during that day, the Trice sisters came. Their visit was in response to an invitation written by the father at the son's request. The will, when written and witnessed, was delivered into the testator's possession on August 3rd, and remained in his possession until his death. His relations with the Trices were and had been cordial and friendly, and it was in their graveyard that he wanted to be buried. All of this appears in the father's evidence. Not by remotest suggestion is any sinister purpose shown.

Trice is Deputy Commissioner of Revenue for Goochland county and bears an excellent reputation. When he went to Columbia and into the testator's room, an aunt was there. She went out. "Frank said, 'Joe, boy, I'm bad off. I am on my last legs. I have lived too fast a life, and I want to make my will.' " He then asked him to get a writing tablet which was on the bureau and a pencil. "I got a pencil and a tablet and handed it to him, and he handed it to me and said, 'Joe, I want you to write it.' " Trice made no suggestion whatever as to what was to be written.

The testator wanted some one from Richmond sent for to put the will in final form, and it was then that Trice made his only suggestion. He said that Mr. Miller was entirely competent, was at hand and could do the work as well as any man in Richmond. It was in this way that Mr. Miller chanced to be chosen.

Mr. Miller, in company with Trice, went to Columbia, and was taken to the testator's room. He testified, in effect, as follows: The father and some others were probably there. They withdrew but Trice remained at the testator's request. He then told him that he wanted him to prepare his will and gave him a memorandum. He already had the memorandum which Trice had prepared. "Mr. Jenkins did most of the talking. I asked him if what this memorandum contained was what he wanted written into his will, and he said it was, with the exception of a little memorandum he had on his table with regard to a donation to a church."

"I carried a sheet of yellow paper with me, and I told Mr. Jenkins that he could dictate briefly what he wanted and I would write it down on my memorandum, and he did so. I wrote it down, and after getting, as I thought, everything he wanted, everything he told me

about, I read it over to him very carefully and asked him if that expressed all that he wanted incorporated in the will. He said that was all right, that was what he wanted. I said, 'I will not write this up now, I will take it to my office and typewrite it and send it back to you for your signature.' He said that was all right.".

Later he wrote the will entirely from his memorandum and the one that Mr. Jenkins had prepared. Mr. Jenkins was very nervous, but he saw no indication of aberration of mind.

This legacy to the father and mother was discussed.

"Q. Was there any discussion with Mr. Jenkins as to the provision to be made for his father and mother?

"A. Yes, sir. I asked Mr. Jenkins—I found he was not going to leave his entire estate to his father and mother, and I asked him, 'Now what is the exact amount you want to leave your mother and father?' He said, 'Well, they have some property of their own, and I want to leave them $2,500.00 a year, and they can live comfortably on that with what property they already have.'

"Q. Do you recall whether that particular feature of the will was covered in the memorandum that Mr. Trice brought you?

"A. I don't recall that it was.

"Q. You don't know whether it was set down there, or not?

"A. I feel very certain it was not."

In the memorandum which Trice took to Miller, Trice's wife was given $500.00. This Miller afterwards changed to $1,000.00 under the testator's express order.

The matter of attesting witnesses came up for consideration, and Jenkins named three gentlemen whom

he desired to serve. One of them was out of place, and Mr. Pitts, a Columbia merchant, was selected in his stead, but both Huckstep and Hodgson, who were his friends and acquaintances, Mr. Jenkins named.

All of these have testified. Mr. Pitts, who was one of the subscribing witnesses, went to the sick room, and after some casual conversation Jenkins said: "I reckon you gentlemen want to get back to business and so we will proceed." Trice produced the will and called Jenkins' attention to an erasure. "Then Mr. Jenkins told Mr. Trice to take that will back to Mr. Miller and if it was all right to return it, otherwise to have him draw a new will and return it to him." He saw nothing to indicate that the testator was not competent to make a will. He was very nervous and had difficulty in locating the line on which to place his signature and was assisted by one of the subscribing witnesses.

G. P. Hodgson was another witness of the will. He had known the testator all his life. In the sick room there was a little inconsequential talk when Jenkins said, "You gentlemen are business men, you want to get back to town, so we might as well proceed with the business in hand." He had difficulty in signing the paper, and laughingly remarked: "Can't you sign it for me?" Something was said about erasures. "Mr. Jenkins told Mr. Trice to take that paper back to Mr. Miller and ask Mr. Miller if the erasures in there invalidated the will in any way, and if it did, to rewrite it and send them both back to him. Mr. Trice said, 'What must I do with the other one? Destroy it?' He said, 'No, don't destroy anything, bring both back to me and I will destroy the one I want.'"

After they left the room, this witness remembered

that Mr. Pitts and Mr. Huckstep had not read the attesting clause which recited that the testator was of sound mind. They then talked over that matter and were of opinion that he was.

Mr. George H. Huckstep, the other subscribing witness, has testified to the same effect.

The painstaking and able judge who presided at the trial reached the conclusion, "That in the matter of undue influence, it appears from the evidence introduced in the trial of this case, as to which evidence, in the respects hereinafter recited, there is no conflict, as follows: That John Anderson Trice, whom the testator, Frank B. Jenkins, had not previously seen for a number of months, was sent for by said testator to aid him in having his will prepared; that said Trice was a near cousin and a friend of said testator, but held no other relation to him; that said Trice took no part in the preparation and execution of said will, except to carry out explicitly the directions of said testator, including the making of a partial written memorandum therefor at the dictation of said testator, the securing of the services of a skilled draftsman to write said will, and the summoning and bringing to said testator of witnesses to attest the execution of said will; that each and every provision embraced in said will was placed therein by the draftsman thereof at the direction of the testator; that said Trice neither by words nor conduct, and neither directly nor indirectly, was responsible for the inclusion in said will of any provision, or of any part of any provision thereof; that said Trice exhibited no secrecy or concealment in the part which he had in the preparation and execution of said will, except such as was proper and usual in a private and confidential matter such as the making of a will; and that said Trice did not exercise over said testator in the

matter of said will any undue or improper influence whatever.

"That there did not exist between said testator and said Trice any confidential relation in the sense known to the law and such as might support a presumption, if such relation had existed, of the use of undue influence by said Trice over said testator in the matter of said will."

With all of this we are in full accord.

 It is contended, however, that when a will is made which differs from previous expressions of intention and in favor of those who stand in relations of confidence, it raises a violent presumption of fraud and undue influence. To support this we are cited to the case of *Whitelaw* v. *Sims*, 90 Va. 588, 19 S. E. 113, in which the court, following *Hartman* v. *Strickler*, 82 Va. 238, said: "When a will executed by an old man differs from his previously expressed intentions, and is made in favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of fraud and undue influence, which should be overcome by satisfactory testimony."

Manifestly, the mere making of a new will raises no presumption of fraud. Trice was not a dependent and so, to make these cases apply, he must have been a confident, as the term is there used. To ascertain the necessary degree of confidence, we look to later cases.

*Hoover* v. *Neff*, 107 Va. 441, 59 S. E. 428, deals with a deed executed *in extremis* by a wife to her husband. It was set aside by the trial court. This court held that "cases of that kind plainly turn upon the exercise of actual undue influence * * not upon any presumption of invalidity," citing *Orr* v. *Pennington*, 93 Va. 268, 24 S. E. 928. It was furthermore said that this relationship was a fact to be considered, but that

it was not sufficient to raise the presumption relied
upon is made manifest by the reversal of the trial
court.

*In Wood* v. *Wood,* 90 Va. 470, 63 S. E. 994, the will
of a father who favored a daughter was sustained.
Even that relationship was not enough.

*Dearing* v. *Dearing,* 132 Va. 178, 111 S. E. 286, was
a case wherein it appeared that a testator went by the
advice of physicians to the home of his kinspeople,
among whom was J. A. Dearing, a member of the
household. There a will was privately executed. J.
A. Dearing was draftsman, a beneficiary, and executor.
That will was sustained. In the course of its opinion,
the court quoted with approval this language from
Baron Parke, in *Butlin* v. *Barry,* 1 Curt. Ecc. 637: "All
that can be truly said is, that if a person, whether an
attorney or not, prepare a will with a legacy to himself,
it is at most a suspicious circumstance of more or less
weight, according to the facts of each particular case;
in some of no weight at all, as in the case suggested
varying according to circumstances; for instance, the
*quantum* of the legacy, the portion it bears to the prop-
erty disposed of, and numerous other contingencies."

It was held there that the burden of proof was still
upon those who charged misconduct, and that "it is
not sufficient to show that the circumstances attending
its execution are consistent with the hypothesis of its
having been obtained by undue influence; it must be
shown that they are inconsistent with a contrary
hypothesis." Schouler on Wills (5th ed.), section 239.

If the presumption of fraud did not obt in in that
case, for a stronger reason it does not arise in this.
Here was no undue influence, and, indeed, no influence
at all nor can we indulge in presumptions or suspicions
because one will was revoked and another written.

Trice was a cousin; he did not volunteer, but was sent for, and Miller's testimony establishes, beyond peradventure, that every provision of the will, as written, manifested the purpose of the testator only. In short, it was his will.

For the proponents, thirteen instructions were given, and to each of them exception was duly taken. For the contestants, eleven were given and nineteen refused.

This is instruction No. 1, given at the request of the proponents: "The court instructs the jury that no evidence has been introduced in this case showing the exercise of undue influence over the testator, Frank B. Jenkins, to induce him to make the will of July 29, 1926, and that, therefore, the jury cannot consider the matter of undue influence in arriving at their verdict in this case."

Two objections were made. It is said that there is sufficient evidence in the record to support a verdict founded on undue influence. That proposition has been considered and we pass to the second, which is that it is peremptory and forbidden by section 6003 of the Code.

This claim is answered so completely by the opinion of Judge Prentis in *Core* v. *Core's Adm'rs*, 139 Va. 1, 124 S. E. 453, that it is hardly necessary to do more than to refer to that case.

There, as here, it was charged that a will was written by one without testamentary capacity and in the last stages of progressive senility, and furthermore that it was induced by the fraud and undue influence of a brother. Complaint was made of the fact that the court refused an instruction on the subject of undue influence offered by the contestant, and at the instance of the proponents told the jury "that there is no evi-

dence to support the charge of undue influence in this case, so that the question of undue influence is eliminated from this case." Judge Prentis said: "We are clear in our view that the court held correctly as to this. To have suggested that they could have found, under the testimony submitted, that any fraud had been committed by William Thomas Core, or that any undue influence or coercion had been exerted by him, or by Mollie T. Core, to induce this will, would have been clearly erroneous. There is nothing in the evidence upon which such an instruction could be fairly based, and if a verdict founded upon that idea had been returned it would have been unsupported by and contrary to the evidence."

But for this instruction the jury might have returned a verdict for the contestants. In such a contingency it would have been impossible to say if it rested on testamentary incapacity, which would have been a sure foundation, or on undue influence, which would have been no foundation at all. The instruction was plainly right. It was not peremptory, and simply cut away dead wood.

The second instruction told the jury that the uncontradicted testimony is that the will was formally signed and attested as required by law. As to these facts there is no dispute, and so the instruction should have been given.

This is the third instruction: "The court instructs the jury that a portion of a will may be inoperative and of no effect, yet the remainder of the instrument may stand as the last will of the testator. The court tells the jury that if they believe from the evidence that the testator, Frank B. Jenkins, in that clause of his will giving to Lois Trice the ring described in the will as 'the diamond ring which was my mother's,'

referred to property which in fact was not his own, that fact, standing alone, does not affect the validity of the remainder of the will."

It did not tell the jury that a testator might dispose of property not his own, but it did tell them that an attempt to do this would not of itself invalidate the entire will. From the evidence, it appears that the ring in controversy, did not belong to Mr. Jenkins. If that were true, he could not, of course, give it away, and his attempt to do so was a matter which might have been and doubtless was with propriety, argued to the jury as evidence of testamentary incapacity. It was a circumstance to be considered by them, but it is perfectly plain, as a matter of law, it was not a controlling circumstance.

Instruction three and one-half told the jury that an immaterial alteration did not affect the validity of the will, whether made before or after its execution.

Its draftsman, inadvertently, departed from his memorandum and described Willie McEwing and Daisy Pace as the daughters of William Trice, whereas Willie McEwing was in fact the daughter of William Trice and Daisy Pace the daughter of Henry Pace. J. A. Trice testified that this change was made before the will was executed, and that the will so changed was slowly and carefully read to the testator. Miller, upon reflection, also thought this was a fact, but he was not certain. Trice, though an interested witness, was not interested in this alteration. Indeed, nobody was. No beneficiaries were affected, and there is no question as to the identity of the parties. It was wholly immaterial, and the instruction, properly, so told the jury. 40 Cyc. 1097; *Cogbill* v. *Cogbill*, 2 Hen. & Munf. (12 Va.) 467, 523.

█ This is instruction No. 4: "The court instructs the jury that every person over twenty-one (21) years of age and of sound mind is entitled under the law to make a will and to dispose of his property as he pleases, and to discriminate against or among his next of kin as he may choose.

"And while the burden of proof is upon those offering a will for probate, to show testamentary capacity on the part of the testator at the time the will was executed to the satisfaction of the jury, yet the court tells the jury that all men are presumed to be sane and capable of making a will until the contrary is proved, and that this presumption is to be taken into consideration by the jury in determining the question of competency."

It was approved in *Huff* v. *Welch*, 115 Va. 74, 78 S. E. 573, and in *Rust* v. *Reid*, 124 Va. 1, 97 S. E. 324.

█ Instruction No. 5 told the jury that it is sufficient if the testator were mentally capable at the time of its execution, whatever may have been his mental condition either before or after the will was made. This was a proper instruction. *Forehand* v. *Sawyer*, 147 Va. 105, 136 S. E. 683.

█ The sixth instruction was to the effect that the testimony of credible witnesses present at the execution of the will, and particularly of attesting witnesses, is entitled to peculiar weight.

Instructions 7 and 8 deal generally with the same subject. They are:

█ 7. "The court instructs the jury that it is not necessary that a person should possess the highest qualities of mind in order to make a will, nor that he should have the same strength of mind which he formerly may have had; the mind may be in some degree debilitated, the memory may be enfeebled, the understanding may be weak, and the testator may be

wanting in capacity to transact many of the ordinary affairs of life, but it is sufficient if he possess mind enough to understand the nature of the business in which he is engaged in making his will, has a recollection of the property he wishes to dispose of thereby, knows and recalls the objects of his bounty, and the manner in which he wishes to distribute his property among them."

8. "The court instructs the jury that neither sickness, habitual alcoholism, softening of the brain, nor impaired intellect nor all of them combined are sufficient standing alone to render invalid a will, and even if the jury believe from the evidence that any one or more of all of these conditions existed in the case of the testator, when he executed his will in question, and even though the jury shall believe from the evidence that the testator at the time of executing the said will was infirm in health, and even though they may believe from the evidence that his intellect was impaired to some extent, nevertheless, if they shall further believe and find from the evidence that at the time of executing the said will, the said testator was capable of recollecting the property he was about to dispose of, the persons who were the objects of his bounty and the manner in which he wished his property distributed among them, and had an understanding of the nature of the business in which he was engaged in making his will, then the jury must find that he had legal capacity to make a valid disposition of his estate."

These instructions are supported by *Parramore* v. *Taylor*, 11 Gratt. (52 Va.) 220; *Huff* v. *Welch*, 115 Va. 74, 78 S. E. 573; *Portner* v. *Portner*, 133 Va. 251, 112 S. E. 162; *Smith* v. *Ottley*, 144 Va. 406, 132 S. E. 512; and other cases.

In *Parramore* v. *Taylor*, *supra*, it appears that the testator who was seventy-five years old, had been drinking to excess. He was affected with softening of the brain which produced occasional convulsions and partial paralysis. Two convulsions actually occurred while he was dictating the will.

In *Smith* v. *Ottley*, *supra*, Judge Campbell said: "In *Wooddy* v. *Taylor*, 114 Va. 737, 77 S. E. 498, Judge Harrison said: 'As to the charge of mental incapacity, it is said in Robertson's Old Practice, Volume 3, page 337, that "the presumption of competency is not destroyed by any extremity of age. *Browne* v. *Molliston*, 3 Whart. (Pa.) 137. Nor is incompetency established by proving that the mind has been impaired by disease. *Tompkins* v. *Tompkins*, 1 Bailey (S. C.) 92, 19 Am. Dec. 656. It is not necessary that the testator, at the time of making his will, should retain all the force of intellect which he may have had at a former period. If he be still possessed of mind sufficient to comprehend and advise as to the ordinary transactions of his life and to give directions how his business shall be conducted and his estate managed, he may be considered competent to make a will disposing of his estate. Kennedy, J., in *Kachline* v. *Clark*, 4 Whart. (Pa.) 320; *Temple etc.* v. *[Temple]*, *Taylor*, 1 Hen. & Munf. (11 Va.) 476. Those who would impeach the will on the ground that the decedent had become incompetent, must clearly prove that incompetency to exist.' "

This is a subject capable of indefinite elaboration. The books are full of cases, but those cited fairly state the status of the law in Virginia on this subject. The right of control over property and its disposition gives to the frail and old power to command that consideration which otherwise might not always be extended.

The ninth instruction told the jury that though

they might believe the testator drank to excess and was suffering from the effects of this indulgence, they still could not find him wanting in testamentary capacity, if they believed from the evidence that at the time of the execution of the will he was in possession of his faculties as elsewhere defined in the instructions.

There can be no valid objection to this.

The tenth instruction told them that if they believed from the evidence that the testator had sufficient mental capacity when the will was executed, it should not be invalidated because, in their judgment, it was an unwise one, although that was also a circumstance which they might consider in arriving at their verdict—a caution emphasized in instruction ten and one-half, given for the contestants.

This instruction is unobjectionable. *Wohlford* v. *Wohlford*, 121 Va. 699, 93 S. E. 629.

This is instruction No. 11: "The court instructs the jury that under the will of July 29, 1926, should at any time during the lives of Mr. and Mrs. P. P. Jenkins or the survivor of them the income from the estate be insufficient to pay the annuity of $2,500.00 per annum, such deficiency is required by law to be paid out of the corpus of the estate."

The contestants contend that this is error, in that "it was beyond the province of the court in this proceeding to construe the effect of the will," and cite *Reeves* v. *White*, 136 Va. 443, 118 S. E. 103. In that case a letter was admitted to probate as a soldier's will, whose estate consisted of war risk insurance. The court directed the jury to find against it because there was no sufficient designation of a beneficiary. That this ruling has little application to the case in judgment is immediately apparent. Here it was said that the testator, during the last days of his life, assumed an

unnatural attitude towards his parents, and as one of the consequences thereof had made no adequate provisions for them.

It was competent for the trial court to tell the jury just what provision had been made for them. The correctness of what he said, as a matter of fact, is not questioned.

The fourteenth instruction is to the effect that delusions which do not enter into the provisions of the will cannot affect its validity.

In view of the evidence, this was plainly proper. There was testimony to the effect that the testator thought he was suffering from some venereal disease, that he could not move his limbs, etc. These, in no wise, entered into the making of the will and did not remotely control any of its provisions. If a testator, under a delusion as to his ability to use his legs, were to endow a hospital for the treatment of that affliction, such a gift would be the direct outcome of a warped mentality and invalid, but if such a vagary in no wise entered into the disposition of his property, it would be immaterial.

We have not undertaken to answer in detail every objection made relative to instructions given and refused. Objections urged against the action of the court in respect to them cover more than seventy-five pages of contestants' briefs. It is sufficient to say that we have examined them with painstaking care, and are of opinion that they fully and fairly cover this case and every phase of it, and in them we find no error. Since we are of this opinion, it is unnecessary to discuss instructions rejected. If it be conceded that they are all good law, their rejection in such circumstances is not reversible error. Nor is it necessary to consider

in any detail those assignments of error which deal with the action of the court in admitting and rejecting evidence. The record covers hundreds of pages, and in the nature of things no two men would, in every instance, agree upon its competency. In no case has anything been done which denied to the contestants a fair trial, and when that is had no more can be demanded.

For reasons stated, the judgment of the trial court should be affirmed, and it is so ordered.

*Affirmed.*