## Richmond.

## McComb, Et Als, v. Farrow, Et Als.

### November 18, 1920. ·

1. EXPERT AND OPINION EVIDENCE—*Testamentary Capacity—Senile Dementia.*—Where the testamentary capacity of a testator at the time of making a will was in question, the evidence of a doctor, for many years the superintendent of· an insane asylum,. who had examined over 7,000 cases of insanity, including from 1,000 to 1,500 of senile dementia, to the effect that when he examined the testator ten months after the making of the will he was suffering from senile dementia and had suffered from it not only for ten months but for a long time before, was admissible.

2. EXPERT AND OPINION EVIDENCE—*Testamentary Capacity—Senile Dementia.*—Upon an issue of testamentary capacity a physician had testified that he had two conversations with the testator and that on the occasion of the second conversation the testator knew nothing about the first, and further that "he did not know anything about anything," and that he was suffering from a total lapse of memory, caused by senile dementia. The witness was a doctor of over twenty years' experience, and had observed cases of senile dementia in his practice.

   *Held:* That it was not error to admit this testimony.

3. TESTAMENTARY CAPACITY—*Evidence of Non-Expert.*—Upon an issue of testamentary capacity, a non-expert witness who has had full opportunity to observe the condition of the testator's mind, may state his opinion as to the mental condition of the testator, after having first stated the facts and circumstances upon which that opinion was based.

4. EXPERT AND OPINION EVIDENCE—*Opinions of Non-Experts—Insanity.*—While non-expert witnesses, as a rule, are not allowed to give their opinions, inferences or deductions from data stated by them, yet, whenever such an opinion would be of value to the jury and assist them in arrriving at a right conclusion, such opinion is admissible. There are many cases where the witness cannot detail in words impressions made upon him, which the jury was entitled to receive, and one of the notable exceptions to the general rule is in case of insanity.

5. TESTAMENTARY CAPACITY—*Testimony of Non-Expert—Harmless Error.*—Where a will was attacked on the ground of lack of testamentary capacity, a nephew of the testator who had lived with him at different times in a state of great intimacy and who was fully informed of his uncle's business affairs, testified that testator would probably have told him of the making of the will if he had recollected it. Lack of memory was an important factor in the case, and the question was asked as tending to show a probable lack of memory. Although it was doubtful if the question and answer were admissible in the form in which they were put, yet in view, however, of the great weight of other testimony as to the incapacity of the testator at the time of the making of the will, the question and answer, if error, were harmless.

6. WITNESSES—*Cross-Examination—Waiver of Error by Bringing Out Substantially the Same Matter on Re-Examination.*—Objection to matter brought out upon cross-examination, if valid, is waived by substantially the same question being put to the witness on his re-examination in chief.

7. TESTAMENTARY CAPACITY—*Evidence—Change of Opinion of Witness.*—Where it appeared in the evidence that a witness had once entertained the opinion that the testator was competent at the time of his making the will, his testimony that his opinion had since undergone a change, if not admissible, was at least harmless, under the circumstances of the case.

8. TESTAMENTARY CAPACITY—*Questions of Law and Fact.*—Where the evidence is conflicting the question of testamentary capacity is for the jury, and where the question is submitted to the jury under proper instructions covering every phrase of the case, neither the trial court nor the appellate court can interfere with the verdict of the jury.

Error to an order of the Circuit Court of Augusta county ordering the probate of a will. To this order proponents of another will assign error.

*Affirmed.*

The opinion states the case.

*J. M. Perry,* for the plaintiffs in error.

*Timberlake & Nelson, Curry & Curry, Kerr & Crosby,* and *Jos. A. Glasgow,* for the defendants in error.

Burks, J., delivered the opinion of the court.

Reeves McComb died of pneumonia in September, 1918, at the age of seventy-nine years. In March, 1914, he had been adjudged insane and a committee had been appointed to care for his estate. He left three wills dated respectively February 2, 1910, May 3, 1913 and March 14, 1914. The will of May 3, 1913, was offered for probate in the Circuit Court of Augusta county, and, proceeding under sections 2539 and 2542 of the Code of 1904, all persons interested were made parties and a trial by jury was ordered to ascertain "whether any paper, and there being more than one paper, which of the papers produced be the will of the decedent." The jury found that the will of February 2, 1910, was the true last will and testament of the decedent, and the trial court approved the finding and ordered its probate. To that order this writ of error was awarded.

The sole question involved was the mental capacity of the testator. The will of March 14, 1914, was executed the same day that the investigation began and the witnesses were examined as to the appointment of the committee. It is conceded by all of the parties that the testator did not then have the necessary mental capacity to make a will. It is also admitted by the proponents of the will of May 3, 1913, that the testator was competent to make a will on February 2, 1910. The contest centers around the capacity of the testator to make the will of May 3, 1913.

There are numerous assignments of error to the rulings of the trial court on the admission of testimony. There were several other assignments of error which will be noticed in their order.

The first assignment of error was waived and need not be further noticed.

[1] The second assignment of error related to questions propounded to Dr. DeJarnette to which exceptions were duly taken.   Dr. DeJarnette had been for many years assistant superintendent, and later superintendent, of the Western State Hospital for the insane.   He was an expert on mental diseases of thirty years' experience, exclusively among the insane.   He had examined over seven thousand cases and of these from one thousand to fifteen hundred were cases of senile dementia.   Shortly after the committee was appointed for the testator, Dr. DeJarnette examined him for two and one-half hours to ascertain his mental condition and found that "he was profoundly in a state of senile dementia."   He had further testified that senile dementia is a disease of old age, and is due to the degeneration of nerve cells caused from old age.   It is usually manifest first in the memory of recent events.   It is progressive in its character and extends to earlier events and continues until the patient is strictly demented.   It sometimes comes on rather quickly but it is usually slow and progressive in its nature, and without lucid intervals.   The patient may be brighter at some times than at others, but it is a gradual creeping on, "it is like daylight and dark."   After he had testified to this and other similar matters relating to senile dementia, and to his examination of the testator, the following questions were propounded to him and answers given thereto as follows:

"Q. From your knowledge of the insane and people who are afflicted with senile dementia, what would you say was the condition of his mind, say ten months before that, and in the meantime he had had no disease of any kind to weaken his condition or hasten the progress of the disease, and judging from what you saw and observed of him also when you examined him?

"A. I would have thought he had had it several years. His mind, as I said, was practically gone.

"Q. From what you know of the progress and advance and development of senile dementia, Doctor, would you be able to say whether he was of sound mind and disposing memory on the 3rd day of May, 1913?"

On objection to the question it was amended as follows:

"I will add this: founded on your judgment on your careful examination of Mr. McComb and your knowledge of senile dementia?"

Upon enquiry by the witness he was informed that Mr. McComb died about four years after his examination, from pneumonia. He then replied:

"A. From the fact that he lived that long in a demented condition I would infer that the course of his mental decay had been slow, so slow, that his vital faculties had sustained him from the time I saw him  *  *  *  I would think that the progress of the disease was slow, otherwise in this senile dementia they die usually before that.

"Q. Now, I ask you though, from what you know of the progress and development of senile dementia, what, in your opinion, was the condition of his mind and as to whether or not he had a sound mind and disposing memory a year before the time you examined him?

"A. I thought I answered that. I would say from the demented condition he was in when I saw him, I would say he had senile dementia, not only ten months but a long time before that probably. Probably a year or more than that. I feel satisfied he had mental symptoms before that of senile dementia.

"Q. Is a man who has senile dementia of sound mind and disposing memory?

"A. That is more a question of law than for a doctor, but I should think not."

The objection urged to those questions was that they were hypothetical questions not based upon or embracing the facts in evidence affecting the question upon which an opin-

ion was asked and calling for a mere guess. The doctor had seen the testator and observed his physical condition at that time, and it is not claimed that the testator had any physical weakness or disease. On the contrary, the testimony shows that he was in good physical condition, and had been at all times. The witness had before him all the data necessary to give an opinion upon the subject of enquiry. Moreover, the questions were not strictly hypothetical in the sense in which the word is generally used in the cases, but were intended to obtain from the witness his expert knowledge of the scientific fact as to the course of the disease. Nothing is more common than to enquire of physicians who have examined a patient, his opinion as to how long the disease has existed, or upon view of a corpse as to how long the person had been dead. There was no error in the admission of this testimony.

[2] The third assignment of error relates to questions propounded to Dr. Tuttle. The witness had already testified that he had two conversations with the testator, and that on the occasion of the second conversation he knew nothing about the first, and further that "he did not know anything about anything." He had also been asked, and answered as follows:

"Q. Would you undertake to say how he was affected?

"A. In my conversation I just saw that he suffered a total lapse of memory as far as the things I asked him about." And further, that he did not "have mind and memory to remember any business matter." After he had thus testified, he was asked: "Now, based upon your observation of him and your judgment with reference to him, and from what you saw of him and from your knowledge as a doctor, what was his trouble; what was the trouble with his mind, was it senile dementia or what, according to your best judgment?" The witness replied: "It was a total lapse of memory, I would suppose from old age."

"Q. Which is senile dementia, is it?

"A. Yes sir."

The objections to these questions and answers was that the witness was not qualified to testify as an expert that the testator was then suffering from senile dementia, and further that the questions addressed to him were not based upon any material facts which the evidence tended to prove. The witness was a doctor of over twenty years' experience, had observed cases of senile dementia in his practice, and in answering the questions could not well disassociate his opinion as a doctor from that as an individual, but, however this may be, the answer brought out no new matter, and it was not material by what name this total lapse of memory was called. The material point was that there was a total lapse of memory. There was no error in the ruling of the trial court on these questions.

The fourth assignment of error relates to questions propounded to the witness W. W. Farrow. Farrow was a nephew of the testator and, as will hereafter appear, spent considerable time with him. The first question asked this witness, to which objection is made, was as follows:

"Q. Now, Mr. Farrow, basing your opinion from all you know and observed of Mr. McComb, and have testified here, was Mr. McComb of sound mind and disposing memory on the 3rd day of May, 1913, when he made this will that the plaintiffs are asserting?"

To which the witness replied: "I have no hesitancy in stating that he did not have mind sufficient to make a will, or he did not have mind and memory of a disposing character or capacity, and that there was no doubt of the fact that the testator lacked sound mind and disposing memory."

The specific objection to the question and answer was that the witness had no knowledge of the testator's condition in May, 1913, and that his opinion of the testator's then condition accordingly was incompetent. No witness who tes-

tified in the case had anything like the opportunity for observing the mental condition of the testator as the witness Farrow. He lived in the house with him during the months of September, October, November and December, 1910, and January and part of February, 1911. He then went to his home, but in consequence of a letter received from the testator in September, 1912, he returned to the testator's residence in October, 1912, and remained with him during October and November, 1912, leaving in the latter part of November. He again returned to his uncle's house and was with him during the months of November and December, 1913, and January, 1914. During the first visit mentioned he was very active in assisting his uncle in going over all of his papers and arranging them in order, and placing them in such shape as that they could be readily found and handled. The discussion between the uncle and his nephew covered a very wide field, and their relations were of the most intimate nature. He became fully informed of his uncle's business affairs, and on subsequent visits was enabled to assist counsel in litigation in which his uncle was involved, in a manner forbidden by the mental condition of his uncle. He had the fullest opportunity of observing him closely and intimately for months at a time, and testifies at great length and in great detail, giving time, place and circumstances, as to his uncle's mental condition. When asked if in October, 1912, his uncle was of sound mind and disposing memory, he answered "Oh, no, not by any means." It clearly appears from the testimony in the case that the testator labored under the disease of senile dementia, and that that disease is a progressive one without lucid intervals. The witness Farrow had testified that both before and after the making of the will of May 3, 1913, the testator did not have the mental capacity to make a will.

A non-expert witness who has had such full opportunity to observe the condition of the testator's mind, may state

his opinion as to the mental condition of the testator, after having first stated the facts and circumstances upon which that opinion was based. And as said in *Fishburne* v. *Ferguson,* 84 Va. at page 106, 4 S. E. 575, at page 579, the opinion of a witness who has had such opportunities of observation as Farrow had in this cause "is entitled to great weight." While non-expert witnesses, as a rule, are not allowed to give their opinions, inferences or deductions from data stated by them, yet whenever such an opinion would be of value to the jury and assist them in arriving at a right conclusion, such opinion is admissible. There are many instances in the books in which such opinions are received. There are many cases where the witness cannot detail in words impressions made upon him, which the jury was entitled to receive, and one of the notable exceptions to the general rule is in case of insanity. Witnesses cannot always convey to jurors or courts adequate ideas of appearances, and as said by Mr. Justice Holmes, in *Queen* v. *Oklahoma,* 190 U. S. at page 549, 23 Sup. Ct. at page 763, 47 L. Ed. 1175, "after stating such particulars as he can remember, generally only the more striking facts, an ordinary witness is permitted to sum up the total remembered and unremembered impressions of the senses by stating the opinion which they produced. To allow less may deprive a party of important and valuable evidence that can be got at in no other way;" and in 1st Greenleaf on Ev. (16th ed. by Wigmore) in stating the persons who may give their opinions, there is mentioned "persons who have no special skill but have personally observed the matter in issue and cannot adequately state or recite the data so fully and accurately as to put the jury completely in the witnesses' place, and enable them clearly to draw the inferences."

In *Connecticut Mut. Life Ins. Co.* v. *Lathrop,* 111 U. S. at page 620, 4 Sup. Ct. at page 537, 28 L. Ed. 536, it is said:

"The truth is, the statement of a non-professional wit-

ness as to the sanity or insanity, at a particular time, of an individual, whose appearance, manner, habits, and conduct came under his personal observation, is not the expression of mere opinion. In form, it is opinion, because it expresses an inference or conclusion based upon observation of the appearance, manner and motions of another person, of which a correct idea cannot well be communicated in words to others, without embodying, more or less, the impressions or judgment of the witness. But, in a substantial sense, and for every purpose essential to a safe conclusion, the mental condition of an individual, as sane or insane, is a fact, and the expressed opinion of one who has had adequate opportunities to observe his conduct and appearance is but the statement of a fact; not, indeed, a fact established by direct and positive proof, because in most, if not all cases, it is impossible to determine, with absolute certainty, the precise mental condition of another; yet, being founded on actual observation, and being consistent with common experience and the ordinary manifestations of the condition of the mind, it is knowledge, so far as the human intellect can acquire knowledge, upon such subjects. Insanity 'is a disease of the mind, which assumes as many and various forms as there are shades of difference in the human character.' It is, as has been well said 'a condition, which impresses itself as an aggregate on the observer,' and the opinion of one, personally cognizant of the minute circumstances making up that aggregate, and which are detailed in connection with such opinion, is, in its essence, only fact 'at short-hand.' "

The question propounded to the witness was clearly proper and the court committed no error in permitting it to be asked.

The witness Farrow was further asked and answered as follows:

[5] "Q. Now, after he had made this Cochran will (that

is the will of May 3, 1913, propounded by the plaintiffs)
would he have been likely, from your intimacy with him,
to have mentioned it to you if he had any recollection of it?

"A. He told me right after making the will of 1910 when
he came to Texas, that he had made that will, and he seemed
to be very glad that it had been done. When I was with
him in the fall of 1910 here at the lower place, he frequently
spoke of the will in a general way. I am satisfied that if
he had had, when I was here in 1913, any recollection or
memory, or had been conscious at that time that he had
made the will of 1913, he would have told me of it. He had
every confidence in me."

Lack of memory was an important factor in the case,
and the relationship of the parties and the confidence re-
posed by McComb in Farrow was such as to suggest the
probability that if he recollected the making of the will he
would have mentioned it to Farrow. The question was
asked as tending to show a probable lack of memory and
this was an important element in the case. It is doubtful
if the question was admissible in the form in which it was
put, but, in view of the great weight of other testimony
as to the incapacity of the testator at that time, we do not
think the question and answer could have affected the re-
sult.

The fifth assignment of error relates to questions pro-
pounded to the witness, J. B. Patterson. The testator had
been adjudged insane in March, 1914, by the Circuit Court
of Augusta county. At the time the application was made
to adjudicate that question, Patterson, and a number of
other most intelligent and respectable witnesses, went on
the stand and testified that they knew the testator very
well, lived in his neighborhood, and Patterson had pur-
chased timber from him in the spring of 1912, and that
they regarded him of sound and disposing mind and mem-
ory, capable to attend to his business. It also appeared in

evidence that the judge who adjudicated the testator insane thought that he was of sound mind, according to the statements of various witnesses, but that to satisfy himself he had the testator sworn as a witness in his own behalf, and it then developed to the amazement of all present, that the testator was absolutely destitute of memory, and was practically without any mind, and consequently, upon the testimony of the testator himself, he was adjudged insane and a committee appointed for his estate. It also appeared from the testimony of Patterson that he had seen little of the testator during the year of 1913. After these facts had been developed, Patterson was asked, on cross-examination, and answered as follows:

"Q. Now, Mr. Patterson, founding your opinion upon what you saw and knew of Reeves McComb, prior to May 3, 1913, and further founding your opinion upon what you knew and observed of him and the condition of his memory and mind up to, say the time of his death, now, in your judgment did he have a sound mind and disposing memory on the 3rd day of May, 1913, when he made this will here in controversy?"

[6] The witness enquired of the court: "Would that be my opinion now or my opinion at that time?" The court replied that his opinion now was required, and the witness thereupon answered, "From my opinion now I think it would be doubtful." The objection was that the witness was not an expert and that the only opinion he could give was that formed as result of his personal experience, and that he could not state his opinion based in part upon what he had observed in March, 1914, and thereafter. It is probably sufficient answer to this objection to say that the objection, if valid, was waived by the plaintiffs in error, by asking substantially the same question to the witness on his re-examination in chief. In the course of this re-examination counsel was examining the witness as to the

legal requirements of a sufficient mind and memory to make a will, and among other things, asked him the following question:

"Q. The next qualification is that when he comes to make his will he must recollect the object of his bounty, *i. e.*, the persons to whom he wants to give his property and have claims on him. Do you mean to say that on May 3, 1913, Reeves McComb was in such mental condition that he could not recollect to whom he wanted to give his property and the reasons for wanting to give it to them?"

To this question the witness replied:

"A. I answered that before. I saw very little of Mr. McComb in 1913, and I did not feel able to judge what he could have done. That is the position I am in and I do not like to express my opinion."

Now, if the objection aforesaid to the question was sustained, and the answer to that question was stricken out, there would still remain in the record the answer of the witness to the question propounded by the counsel for plaintiffs in error which has just been quoted. It will be observed that the witness, in the answer last quoted, does not speak of a now condition of his mind as to the mental capacity of the testator, but of his then condition. His answer is "I *did* not feel able to judge what he could have done." And he does not like now to express his opinion on the subject. Immediately after the foregoing question by the counsel for the plaintiffs in error had been answered as above stated, counsel for the defendant in error followed it with the following questions, which were answered as follows:

"Q. Isn't this a fair statement of your whole position? If you had been called on in 1913 to say whether you thought he was all right, and I am speaking of May, 1913, you would have said you thought so?

"A. Yes, sir.

"Q. Just as you said in March, 1914, when you testified here, you would have said so then?

"A. Yes, sir.

"Q. But speaking now with all the lights before you and basing your opinion on all that you knew at that time, before that time and since that time, of Reeves McComb, you think it is very doubtful whether he had mind, memory and understanding enough to make a will on May 3, 1913. That is correct, isn't it?

"A. That is my opinion; I think it would be doubtful, yes, sir."

[7] The object of the plaintiffs in error in getting the opinion of the witness as to the mental condition of the testator was to aid the jury in determining what the mental condition of the testator was at the time the will was made. On the other hand, the purpose of the defendants in error was to show that while the witness had once entertained the opinion that the testator was competent in 1913 to make a will, that that opinion had undergone a change; that he was as much surprised as anyone else in 1914 after he had testified to the sanity of the testator, to have it demonstrated by the testator himself that he had neither mind nor memory. It was to counteract the influence that the opinion of the witness might have on the jury, that the defendants in error offered to show that that was not now the opinion of the witness. And for that purpose, under the circumstances of the case, we think no error was committed by the trial court. But if it was error it was harmless.

The sixth assignment of error was the refusal of the court to set aside the verdict as contrary to the law and the evidence. In the petition for the writ of error, it is said: "Your petitioners will endeavor to state the facts in accordance with the rule applicable in the case of a demurrer to the evidence, keeping in view, however, the principle

enunciated in *Huff* v. *Welch,* 115 Va. 74, 88, 78 S. E. 573: 'expressions of opinions by witnesses that the testator was not competent to make a will, based upon facts which do not sustain the opinions, are not to be considered as conflicting with the evidence of the witnesses of the factum who speak of the testator's condition at the time of the execution of the paper in question, and unite in the unqualified statement to the effect that when the paper was executed by the testator his mind was clear and good, and that he knew about what he was doing.' "

[8] There were three attesting witnesses to the will, only one of whom was examined on the trial of the case. Another was a young lady who had gotten married and gone away to some place unknown. Another was secretary of the State Board of Education, and on the day the trial of this issue began wired that the State Board of Education would be in session the next day and probably the day following that, and that he would be unable to attend. The third subscribing witness was introduced and proved the due execution of the will, but he knew nothing about the testamentary capacity of the testator. He was called in after the will had been prepared and asked to sign it as a witness. He was called in by the draftsman of the will, and thinks that he asked the testator if the paper was his will, and the reply was that it was, and that he wanted him to sign it, but he knew nothing further than that. The draftsman of the will was also present at its execution and testified to the full competency of the testator and that the will had been dictated, or rather the material for it had been given him by the testator, and that the testator had explained the reasons why he gave one of his sisters only a life estate when he had given the others the fee; that this sister was well advanced in years and had no children, and he wanted the estate to come back to his other relatives. He fully proved the competency of the testator.

No other witness testified directly to the competency of the testator on May 3, 1913, but it fully appears from the testimony of W. W. Farrow that the testator was suffering from an entire lapse of memory and capacity to attend to his business in November, 1912. Other witnesses testified to substantially the same facts, though not as much in detail as W. W. Farrow. It appears from the expert testimony taken in the case that the testator was suffering from senile dementia; that it is a progressive disease without lucid intervals, and therefore, there was direct conflict between the testimony of the plaintiffs in error and that of the defendants in error as to the mental capacity of the testator on May 3, 1913. Furthermore, doubt is expressed by one of the witnesses for the defendants in error, as to whether in fact the testator ever gave to the scrivener the material for writing that will. Under these conditions it was for the jury to decide whether the testator was of sound and disposing mind on May 3, 1913. The question was submitted to the jury, and instructions were given, to which there were no objections, covering every phase of the case, and the jury found against the will of May 3, 1913, and in favor of the will of February 2, 1910. This is not a case in which either the trial court or this court could interfere with the verdict of the jury. Upon the whole case we are of opinion that no error was committed by the trial court and, therefore, its judgment will be affirmed.

*Affirmed.*