# Richmond

C. C. TATE, ET ALS. v. J. M. CHUMBLEY.

THOMAS M. DOBYNS, JUNIOR v. C. C. TATE, ET ALS., THE HEIRS-AT-LAW OF M. S. TATE, DECEASED.

January 16, 1950.

Record Nos. 3576-3577.

Present, All the Justices.

The opinion states the case.

*Stuart B. Campbell* and *R. William Arthur*, for C. C. Tate, et als.

*Ted Dalton* and *Richard H. Poff*, for J. M. Chumbley.

*Crowell, Deeds & Sutherland*, for Thomas M. Dobyns, Junior.

MILLER, J., delivered the opinion of the court.

Margaret S. Tate, an unmarried woman about ninety years of age, a patient in the Southwestern State Hospital, Marion, Virginia, died in that institution on November 30, 1947.

The object of this litigation is to determine, which, if either, of two paper writings, both being testamentary in

character, dated respectively April 27, 1915, and November 29, 1916, each of which undertakes to dispose of her entire estate, constitutes her last will and testament.

The will of April 27, 1915, hereinafter referred to as the Dobyns will, leaves all of her property to T. M. Dobyns, Sr., with the exception of $1,000, bequeathed to Lucretia Reed, who was a servant of the testatrix. The will of November 29, 1916, gives to Joseph M. Chumbley all of her estate except $1,000, which is likewise bequeathed to Lucretia Reed. This writing will be designated as the Chumbley will.

In the record, the testatrix is called Magg S. Tate, Maggie Tate, M. S. Tate or Miss Magg. Her relatives and acquaintances knew and spoke of her by these several names. For brevity, she will be referred to herein as the testatrix or Miss Magg.

T. M. Dobyns, Sr., principal beneficiary under the earlier will, predeceased testatrix. He left as his heir-at-law a son, T. M. Dobyns, Jr., who, under sec. 5238 of the Code, 1942 (Michie), succeeded to any estate devised or bequeathed his father. He presented that paper writing for probate and Joseph M. Chumbley, principal beneficiary in the latter will, presented that paper for probate.

By proceedings of December 30, 1947, and April 17, 1948, had before the clerk of the Circuit Court of Pulaski county, both papers were admitted to probate.

C. C. Tate and others, heirs and next of kin of testatrix, appealed to the circuit court from these orders of probate. On their motion and under the provisions of sec. 5257 of the Code, an issue was made up to be tried before a jury "as to whether the alleged wills, or either of them, or any part thereof," constituted the true last will and testament of the testatrix.

Upon the first trial there was a hung jury. The second trial resulted in a verdict sustaining the Chumbley will, which was approved by the trial court. From that judgment, C. C. Tate and others, heirs-at-law of testatrix, and T. M. Dobyns, Jr., petitioned for and obtained appeals.

The successful proponent, Joseph M. Chumbley, will be referred to as appellee.

Appellants, C. C. Tate and the other heirs, contend that the evidence conclusively shows that testatrix did not have mental capacity to make either will.

Appellant, T. M. Dobyns, Jr., insists that testatrix was mentally incapacitated to make a will on November 29, 1916, when the Chumbley will was executed, but that her mental capacity to make a will on April 27, 1915, when the Dobyns will was executed, is fully sustained by the evidence.

Among the many errors assigned, appellants insist that the evidence is insufficient to sustain the verdict. As the verdict and judgment upheld the will executed on November 29, 1916, which was the last in point of time, the dominant factual question now presented is whether or not testatrix possessed mental capacity on that date to make a will.

Other questions arose during the trial concerning the effect of certain former adjudications of insanity of the testatrix, the character of the burden of proof encumbent upon the proponent of each will, the form and sufficiency of hypothetical questions propounded to expert witnesses, the admissibility of evidence, the correctness and materiality of several instructions granted or refused at the instance of the litigants, and additional questions too numerous to here recite at length. The rulings of the court on these matters are assigned as error. Those deemed material will be hereinafter set out with more particularity.

Before consideration of any of the questions necessary to be determined, it is proper to recite some of the salient facts disclosed in this voluminous record.

Testatrix was born in the year 1857 near the town of Draper, Pulaski county, Virginia. She was one of three children, but the only daughter of the marriage of Charles C. Tate and Jane Draper Tate. Her two brothers of the full blood predeceased her and their mother. They died without issue long before the events material to this litigation. Her mother was the second wife of Charles C. Tate.

By a former marriage, her father left five children, all of whom died before testatrix. The children and decendants of four of those brothers and sisters of the half-blood are Miss Magg's (the fifth having died without issue) heirs and next of kin, and are the present litigants who insist that neither writing in question constitutes a valid will.

Miss Magg was reared in a home of affluence, refinement and culture. Her father predeceased her mother and after his death, she and her mother continued to live at the home in Draper's Valley near the town of Draper. This consisted of the mansion house and about eight hundred acres of land which had belonged to her mother's family. Upon the death of the mother, Jane Draper Tate, in 1903, Miss Magg became the sole owner of this valuable property and other estate. During the life of her mother, testatrix had assisted in the operation of the farm. Upon her mother's death, at which time testatrix was about forty-six years of age, the entire responsibility of its operation and upkeep fell upon her. In the year 1904, she employed Joseph M. Chumbley as her full-time farm manager and overseer. He was assigned living quarters in the mansion house, and that constituted a part of his compensation.

Colonel T. M. Dobyns, Sr., who had resided near Dublin, Virginia, came to Draper in the year 1913. For the period that he was engaged in business there, he boarded at different intervals of time at the home of testatrix. Miss Magg became much enamoured of him and there is some evidence that marriage was at one time contemplated.

On April 27, 1915, Miss Magg called at the office of John S. Draper, an attorney at law in Pulaski, Virginia, and requested that he draft a will for her, which he did. It is the Dobyns Will.

That will was retained by Miss Magg until August 18, 1915, on which day she forwarded it by registered mail from Draper, Virginia, to T. M. Dobyns, Sr., at Dublin, Virginia. It remained in his possession until his death in 1932, and thereafter in the custody of his son until offered for probate.

Evidence was introduced by the heirs of testatrix to the effect that she was addicted to intemperate use of intoxicants, eccentric, peculiar, abnormal and actually insane and lacked testamentary capacity prior to and when she executed the Dobyns will. Yet there was much testimony and proof that she was mentally capable of making that will. There is also considerable evidence tending to prove that during the six months following the execution of that will, her mental powers became more impaired.

In October, 1915, she was taken ill and was a patient for some days in the Shenandoah Hospital in Roanoke, Virginia. She then secured the services of a nurse who accompanied her when she returned home and remained with her until November 24, 1915.

Her condition culminated in a complaint being made by her half-brother, Thomas L. Tate, which complaint was initiated on advice of a local physician, and resulted in a lunacy commission being held in Pulaski on November 23, 1915, to inquire into Miss Magg's mentality. She was, on that date adjudged to be insane and committed to the Southwestern State Hospital, which she entered the next day. Her condition was diagnosed at that institution as "manic-depressive psychosis—depressed type." She was never formally discharged but remained a ward of the State until her death thirty-two years later. However, she was granted furloughs at different intervals, and in some instances for long periods of time, when she was allowed to return to and live at her home, accompanied and cared for by an attendant.

On motion of Thomas L. Tate, and through proceedings of November 23, 1915, and December 22, 1915, had before the clerk of the Circuit Court of Pulaski county, E. C. Gannaway was appointed Miss Magg's committee. On the latter date, she was represented by counsel, who appealed to the court from the clerk's order. However, by order of February 24, 1916, the appointment was confirmed, but C. S. Pratt was substituted as her committee in place of E. C. Gannaway.

The committee deemed it necessary to make sale of some of Miss Magg's real estate in order to pay her indebtedness. A bill of complaint to accomplish that purpose, duly sworn to by the committee alleging that his ward was insane, was filed in the Circuit Court of Pulaski county. That cause was, by decree of September 9, 1916, referred to O. C. Brewer, a commissioner of the court, to ascertain and report the amount of debts owing by "Miss M. S. Tate, an insane person," and the necessity for sale of her real estate or any part thereof to defray her indebtedness. In his report filed November 11, 1916, the commissioner stated that Miss Magg was "incurably insane" and that some three hundred and thirty acres of her land should be sold. By decree of November 28, 1916, that report was confirmed by the circuit court, and it is recited therein to "be most advantageous *to said insane person* for the upper or Flora Place to be sold" and it was so ordered and decreed. (Emphasis added.)

While this cause was before the commissioner, Joseph M. Chumbley appeared as a creditor and witness and filed claims totaling $2,010.01, owing to him by Miss Magg. This was a running account from year to year and consisted of compensation, etc., due him as her farm manager. Some question was raised as to whether part of the debt was barred by the statute of limitations. However, the decree of November 28, 1916, directed its payment, and upon sale of the real estate, it was duly paid. Thus Joseph M. Chumbley, as creditor of the incompetent, by appearing, proving, and having his claim paid, became a party to that suit.

On February 22, 1916, three months after Miss Magg's commitment to the Southwestern State Hospital, her mental condition had improved. On March 15, 1916, she had further improved and was furloughed to her committee in care of a special attendant and allowed to go home. She remained there until August 3, 1916, on which date she voluntarily returned to the institution. She stayed in the asylum for three and one-half months, and on November 16, 1916, she was again furloughed and allowed to return to

her home accompanied by an attendant. Except for four months in the year 1920, her furlough lasted for a period of eight years, during which time she lived at her home in Pulaski county. She did not return to the institution to permanently remain until she voluntarily went there on November 24, 1924, from which date she continued as an inmate until her death.

In November, 1916, while Miss Magg was at her home on furlough, it became necessary for her to enter the Jefferson Hospital in Roanoke, Virginia, to undergo an operation. She left her home on the evening of November 29th and reached the hospital late that night and was operated on the next morning. However, on the 29th of November, 1916, before she left for Roanoke, at her invitation, Captain Thomas Scott West, his daughter, Cornelia West Painter, and her husband, Jas. W. Painter, and other members of that family, were guests for the day of Miss Magg at her home and took the midday meal with her. Also present upon that occasion was Miss Magg's young nurse and attendant, sixteen year old Susie Carter, now Brickey. She had been sent with Miss Magg by the hospital authorities to be her nurse and attendant while she was on furlough.

At Miss Magg's request, Captain West drew her will. It was signed by her and witnessed by Susie Carter and Jas. W. Painter, and remained in the possession of Jas. W. Painter until his death in 1936. Shortly thereafter it was delivered by his widow to Joseph M. Chumbley, by whom it was retained until offered for probate. It is the paper writing dated November 29, 1916, known as the Chumbley will, found by the jury and judgment of the trial court to be Miss Magg's last will and testament.

At the threshold of this proceeding, by plea of *res adjudicata* (estoppel of record), and at later stages of the trial, by appropriate motions, the heirs of the testatrix, and T. M. Dobyns, Jr., asserted that appellee was not entitled to probate of the Chumbley will. They then said and now insist that the record discloses that Miss Magg was adjudged

insane by the lunacy commission on November 23, 1915; that a committee was appointed for her by the clerk's orders of November 23, 1915; and December 22, 1915, which were approved by the circuit court on February 24, 1916, and and that she was found and adjudged to be insane by the Circuit Court of Pulaski county by its decree of November 28, 1916, in the suit brought by her committee for sale of her real estate. They then allege that as Joseph M. Chumbley elected to become a party to that latter cause when he knew Miss Magg had been adjudged insane and was being proceeded against as an insane person,—a necessary fact and status upon which jurisdiction could be acquired and retained in that suit,—and as her insanity was therein confirmed and established, it is therefore an issue, status and matter that is *res adjudicata* insofar as Joseph M. Chumbley is concerned and he is forever foreclosed and precluded from saying that she was not insane on November 29, 1916.

Joseph M. Chumbley was not a party to the lunacy proceeding of November 23, 1915, or that appointing a committee, which was made final by an order of the circuit court on February 24, 1916: He was, however, a party to the chancery suit to sell Miss Magg's land and make payment of her indebtedness. He is precluded from denying the finality and conclusiveness of the decrees and judgment in that cause upon the precise issues therein determined. But to now constitute an estoppel of record in this case, and so prevent his probate of this will, the identical question here presented must have been at issue and determined in the former suit. *Tarter* v. *Wilson*, 95 Va. 19, 27 S. E. 818; *Miller* v. *Wills*, 95 Va. 337, 28 S. E. 337; *Chesapeake, etc., Ry. Co.* v. *Rison*, 99 Va. 18, 37 S. E. 320; *Southern Ry. Co.* v. *Washington, etc., Ry. Co.*, 102 Va. 483, 46 S. E. 784, and *Gilmer* v. *Brown*, 186 Va. 630, 44 S. E. (2d) 16.

We are of opinion that in none of these proceedings to which Joseph M. Chumbley was not a party, as well as the suit to which he was a party, was the issue before the court or tribunal identical with that presented in this cause. *Lew-*

*andowski* v. *Zuzak*, 305 Ill. 612, 137 N. E. 500; *Keeley* v. *Moore*, 196 U. S. 38, 25 S. Ct. 169, 49 L. ed. 516; Page on Wills, Lifetime Ed., Vol. 1, sec. 153, p. 309.

The commission of lunacy, when it adjudged Miss Magg insane, and the clerk of the circuit court and that court in the proceeding for appointment of a committee, as in the chancery suit, lacked the power and jurisdiction to determine whether or not this testatrix then or at any other time had testamentary capacity. Nor did they undertake so to decide. The commission and the court determined that she was insane and thus incompetent to deal with and manage her property and estate, and should be confined. The chancery cause ordered sale of her land and payment of her debts. Yet in these causes neither tribunal was concerned with whether she enjoyed periods of normalcy or lucid intervals of greater or less duration. Her testamentary capacity then or at any past or future time was not an issue. Thus none of those adjudications can, as a matter of law, be used to estop Joseph M. Chumbley from offering the will for probate. *Gilmer* v. *Brown, supra*.

█ This conclusion, we also think, is in keeping with the legislative intent made manifest in chapter 212 of the Code, 1942. The express and mandatory language of sec. 5257 of that chapter reads, in part: "If any person interested ask it, it (the court) shall order a trial by jury to ascertain whether any paper, or if there be more than one, which of the papers produced be the will of the decedent * * *." That statute evinces the legislative purpose and intent that the issue of *devisavit vel non* shall be submitted to a jury, if desired.

Section 5259 of the Code, under which an interested party may proceed by bill in equity to "impeach or establish the will" is equally clear and explicit and even more mandatory that one so attempting shall be entitled to a jury trial on all factual issues. Under that section, it is provided that "* * * a trial by jury shall be ordered." Upon a bill in equity being filed, determination of the issue of *devisavit vel non* by

a jury is thereby made mandatory unless actually waived by all interested parties.

in our opinion, the effect of these statutes is that an interested party may have the actual mental capacity of a testator to make a will factually decided through the procedure afforded in chapter 212 of the Code, 1942 (Michie), and that right cannot be foreclosed by estoppel of record or rendered *res adjudicata* in any judicial or quasi-judicial proceeding to which such interested person may be a party other than by one of probate. The issue of whether or not a testator had mental capacity to make a particular will can be rendered *res adjudicata* in a probate proceeding and none other.

In the case of *Gilmer* v. *Brown, supra,* decided in 1947, the legal effect of the appointment of a committee for a person under section 1080a of the Code, as bearing upon the mental capacity of such person to execute a will, was considered. It was there pointed out that the appointment of a committee or guardian under that section, which was first enacted in 1932 (Acts 1932, p. 518), could be had for either mental or physical infirmities or both. The holding was that an appointment under that section was not to be regarded as *prima facie* evidence of testamentary incapacity of the party for whom such committee or guardian was appointed.

The language and purpose of section 1080a is materially different from that found in Acts of 1910, ch. 102, p. 135, which, with subsequent amendments now appears as section 1017 of the Code of 1942, under which the commission of lunacy was held on Miss Magg. The adjudication of insanity by a commission of lunacy under the provisions of that Act as it read in 1915, and the appointment of a committee for such insane person under Acts of General Assembly, 1902-03-04, ch. 139, p. 121 (that being the act under which Miss Magg's committee was appointed by the circuit court), which, as subsequently amended, now appears as section 1050 of the Code, 1942, did, in our opinion, con-

stitute and must be regarded as *prima facie* evidence of testamentary incapacity of the party so adjudged insane. Of similar and like effect was the finding and adjudication that Miss Magg was insane that was made in the fall of 1916, by the circuit court in the suit to sell her real estate.

Is the evidence appearing in the record upon which appellee, Joseph M. Chumbley, relies, sufficient to overcome the *prima facie* presumption of testamentary incapacity on the part of the testatrix and establish her testamentary capacity on the date she executed the will under which he claims?

■ Mental capacity to execute a valid will may factually exist and be shown though the testator has been adjudged insane. *Lucas* v. *Parsons*, 27 Ga. 593; *In re Draper's Estate*, 215 Pa. 314, 64 A. 520; *Lewandowski* v. *Zuzak, supra*; *Keeley* v. *Moore, supra*; Page on Wills, Lifetime Ed., Vol. 1, secs. 148-153, pp. 301-309.

■ A party may have been adjudged insane, yet to make a valid will the law only requires that at the time of composing and executing it, he be factually so far free of his affliction that the ordinary legal consequences of his insanity do not apply to what he is then doing. What his mental status is at the time he makes and executes the will is the controlling factor. *Forehand* v. *Sawyer*, 147 Va. 105, 136 S. E. 683; *Jenkins* v. *Trice*, 152 Va. 411, 147 S. E. 251.

The test of mental capacity required to execute a valid will is succinctly stated in *In re Weedman's Estate*, 254 Ill. 504, 98 N. E. 956, and quoted with approval in the recent case of *Gilmer* v. *Brown, supra*:

"Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid. If at the time of its execution the testatrix was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property, that is sufficient." (186 Va. at p. 639.)

■ The voluminous evidence tending to prove or dis-

prove Miss Magg's mental capacity to execute the Chumbley will was highly conflicting. No benefit would be derived from reciting it at length. It is sufficient to say that Captain West, the draftsman, and Jas. W. Painter, one of the attesting witnesses to the will, are dead. However, Susie Carter (now Brickey), the other attesting witness, and Cornelia West Painter, who was present in the home of the testatrix the day the will was written, are living. Both testified before the jury. They stated unequivocally and in no uncertain terms that Miss Magg was at that time of sound mind. Dr. A. P. Jones, who saw and talked with her that night at the Jefferson Hospital in Roanoke, was also of the opinion that her mental condition was such as to enable her to fully understand what she was doing. Their testimony is aided and strengthened by several lay and expert witnesses. Some of the testimony of the experts was that manic depressive psychosis with which the testatrix was afflicted is of changeable nature. At times, one so suffering is insane, but at other times, the patient enjoys long lucid intervals and periods of normalcy. This testimony of those present at the execution of the will, supplemented and aided by that of other witnesses, both lay and expert, was sufficient to overcome the presumption of testamentary incapacity and justify the factual finding of the jury. *Jenkins* v. *Trice, supra.*

Appellants say that the court committed reversible error in allowing counsel for appellee to propound to the expert witnesses, Drs. Blaylock, Gieson, Morrow and Arnold, hypothetical questions, the purpose of which was to elicit answers to the effect that testatrix entertained mental capacity to make a will on November 29, 1916, without embodying in the questions material uncontradicted facts bearing on the subject upon which the opinion was sought. In short, they say the hypothetical questions propounded the experts did not fully cover the case as presented by the evidence.

In *Lester* v. *Simpkins*, 117 Va. 55, at p. 68, 83 S. E. 1062, it is said:

"It is a well settled rule that a hypothetical question to

an expert witness must embody all the material facts which the evidence tends to prove, affecting the question upon which the expert is asked to express an opinion".

We also find that principle stated thus in *Bowen* v. *Bowen*, 122 Va. 1, 6, 94 S. E. 166, 167:

"In order to enable the expert to express an opinion which will be of value, such an interrogatory should embody all of the facts pertinent to the issue involved in the question, as to which there is no conflict in the evidence, together with the other evidence relied upon by the propounder of the question for the determination of such issue in his favor, as to which the testimony is conflicting."

Of like effect are the decisions of *Upton & Co., Inc.* v. *Reeve*, 123 Va. 241, 96 S. E. 277, and *Tugman* v. *Riverside, etc., Cotton Mills*, 144 Va. 473, 132 S. E. 179.

This announced principle of law, to which we adhere, must, however, be reasonably and sensibly applied with reference to the status of the proof at the time such hypothetical question is asked.

Appellee was the first litigant who presented evidence before the jury to sustain his contention. When all of his documentary evidence and testimony of lay witnesses to be offered was concluded, that of the three experts, Drs. Blaylock, Gieson and Morrow, who testified in his behalf, was introduced before he rested his case. It is obvious that they could be propounded hypothetical questions only on such evidence as was then before the jury. Even so, the questions asked by appellee's counsel were not as inclusive as they might have been. Yet a careful examination of that evidence discloses that the questions propounded contained about all of the essential factual matter then tending to establish the mental condition of testatrix on or about the time the Chumbley will was executed. It also appears that any facts deemed material which had been omitted were supplied and cured any error, if made, in the cross-examination of these experts. *Hogan* v. *Miller*, 156 Va. 166, 157 S. E. 540; *Norfolk, etc., Ry. Co.* v. *Spears*, 110 Va. 110, 65 S. E. 482.

■ The fourth witness, Dr. Arnold, was offered as an expert on behalf of appellant Dobyns at a stage of the trial when the evidence had been more fully developed. However, the question propounded to him by counsel for appellee was asked with the assertion of counsel and the approval of the court that for the purpose of such question the witness would be treated and considered as a witness on behalf of appellee with the right of cross-examination relative thereto accorded appellants. In that cross-examination by counsel for appellants that followed, we think any and all material matter omitted in the original question propounded by appellee's counsel was supplied. After being so supplied in questions asked by appellants' counsel, the expert witness expressed his opinion in response thereto. This cured any error that otherwise may have existed. *Tugman* v. *Riverside, etc., Cotton Mills, supra.*

It was also asserted that the hypothetical questions were objectionable because, along with properly recited facts shown in evidence and in the questions justly assumed to be true, the questions with respect to the matter testified to by three named witnesses recited what those witnesses had testified instead of merely reciting and assuming as true the facts theretofore stated by them. It is said that the hypothetical questions so reciting the testimony of these named witnesses permitted the expert to whom propounded, in giving his answer, to invade the province of the jury and pass upon the credibility of the named witnesses. Thus they insist the experts were invited to and did by their answers vouch the credibility of the three lay witnesses and so precluded the jury from inquiring into the correctness and truth of the statements of the three witnesses so recited in the question. *McMechem* v. *McMechem*, 17 W. Va. 683, 41 Am. Rep. 682, and *Kerr* v. *Lunsford*, 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668.

■ When these questions were asked, the testimony recited therein as having been given by three witnesses had not been contradicted. As to that part of the questions so

framed under those circumstances, though not approved by us, we do not deem a failure to adhere to the proper form and substance of a hypothetical question of sufficient moment to have harmfully affected appellant's rights. We find in this no reversible error.

Much evidence upon matters too remote in point of time to have any proper or material bearing on Miss Magg's mental capacity when the respective wills were made, some of which was objected to and some not, was placed before the jury. The introduction of that character of testimony was, however, indulged in by appellants to as marked if not greater degree than by appellee. The rulings of the court upon objections of appellants to this testimony contain no errors of which they may justly complain.

Appellant Dobyns contends that the court should not have required all interested parties to litigate their rights in one proceeding. He says that upon proof of the proper formal execution of the Dobyns will, the sanity of the testatrix at that time. was presumed, but due to the adjudication of insanity of the testatrix before execution of the Chumbley will, appellee enjoyed no such presumption upon proof of its formal execution. For these reasons that appellant says it was rendered imperative that contestants, C. C. Tate and others, be required to litigate their attack upon the two wills in different proceedings. He insists that under these facts the litigation in one action of the rights of all parties would be confusing and render it most difficult for the jury to understand the issues involved.

The trial of the rights of all interested parties in one proceeding is expressly allowed by sec. 5257 of the Code, 1942. The first sentence of that section reads:

"In every such proceeding the court may require all testamentary papers of the same decedent to be produced."

No injustice to any litigant or violation of the rights of any party is shown to have been caused by the procedure adopted. Determination of the question raised by appellant

Dobyn's contention, we think, rested in the sound discretion of the court.

We find no error in the procedure followed.

This appellant also insists that after the court required all claimants to litigate their rights in one proceeding, the real and true distinction in the character of proof required and the burden imposed upon the proponents of the respective wills was not sufficiently observed during the trial or clearly pointed out to the jury.

 Careful examination of the record discloses a definite recognition by the trial judge of the difference in the status of the two wills. It also appears from the following instructions, the first given at the instance of appellant Dobyns, and the other two on behalf of the heirs, that this distinction in the status of the wills and the character of proof encumbent upon the respective proponents was made evident to the jury.

"Instruction B. The Court instructs the jury that every person over twenty-one (21) years of age of sound mind is entitled under the law to make a will and to dispose of her property as she pleases and to discriminate against or among his next of kin as he may choose.

"And while the burden of proof is upon those offering a will for probate, to show testamentary capacity on the part of the testatrix at the time the will was executed to the satisfaction of the jury, yet the court tells the jury that all persons who have not been adjudged insane are presumed to be sane and capable of making a will until the contrary is proved, and that this presumption is to be taken into consideration by the jury in determining the question of competency."

"Instruction 6. The Court instructs the jury that while there is a presumption that every person is sane until such person has been declared insane, nevertheless, the jury should consider in determining whether Maggie S. Tate was competent to make a will on the 27th day of April, 1915, the committal proceedings had in November of that year, along

with all of the other evidence introduced in the case, and determine from all of the testimony whether Maggie S. Tate on the 27th day of April, 1915, had sufficient testamentary capacity to execute a will, and the burden of establishing this fact under all of the evidence in the case is upon T. M. Dobyns, Jr., and if he has failed to bear it, the jury will find against the purported will of April 27, 1915."

"Instruction 7. The Court further instructs the jury that as to the purported will of November 29, 1916, as this will was executed after Maggie S. Tate had been committed to the Southwestern State Hospital, the condition of insanity established by the committal proceedings of November 23, 1915, is presumed to continue, and the burden is on Joseph M. Chumbley, the proponent of the purported will of November 29, 1916, to establish by clear and convincing evidence that on that date Maggie S. Tate was possessed of testamentary capacity as defined in these instructions and that the purported will of November 29, 1916, was not affected by the diseased mental condition previously established."

That proof of due execution of the Dobyns will carried with it a presumption of sanity of the testatrix and that the adjudication of Miss Magg's insanity which took place before the execution of the Chumbley will created *prima facie* testamentary incapacity to execute that will which had to be overcome by proof was by the instructions sufficiently conveyed to the jury.

The giving of the following instruction at the instance of appellee is assigned as error:

"The Court instructs the jury that although James W. Painter, one of the attesting witnesses to the Chumbley will is dead, yet you are instructed that the placing of his name to the will is, in effect, certificate to his belief of the mental capacity of Miss Mag S. Tate at the time, and that the will was executed by her freely and understandingly, with full knowledge of its contents; and you are further instructed that the attestation by the said James W. Painter

is, in effect, a representation that such witness believed the testatrix understood what she was doing and was competent to do so at the time."

In *Young* v. *Barner*, 27 Gratt. (68 Va.) 96, at p. 103, it is said:

"It is also held upon good authority, that a person who signs his name as a witness to a will, by his act of attestation solemnly testifies to the sanity of the testator."

We find in *Chappell* v. *Trent*, 90 Va. 849, 19 S. E. 314, the language of Walworth, Chancellor in *Scribner* v. *Crane*, 2 Paige (N. Y.) 147, 149, 21 Am. Dec. 81, quoted with approval.

"No person is justified in putting his name as a subscribing witness to a will unless he knows from the testator himself that he understands what he is doing. The witness should also be satisfied from his own knowledge of the state of the testator's mental capacity; that he is of sound and disposing mind and memory. By placing his name to the instrument, the witness, in effect, certifies to his own knowledge of the mental capacity of the testator, and that the will was executed by him freely and understandingly, with a full knowledge of its contents."

To somewhat similar effect is the statement from *Redford* v. *Booker*, 166 Va. 561, 185 S. E. 879:

"In contests of this kind we turn first to the testimony of attesting witnesses. Usually they know what they are doing. The presumption is that they would not aid in the execution of a will had they cause to doubt its validity."

The testamentary capacity of Miss Magg to execute the will to which Jas. W. Painter was an attesting witness was in issue. Proponent of that will was entitled to have the jury informed of the legal effect of the attestation by the deceased witness. Otherwise, they might speculate upon its effect or attach to the attestation improper weight or no significance whatever. The instruction properly advised them of the legal effect of that attestation.

Appellant Dobyns, in his assignment of error No.

22, also asserts that the court erred by admitting testimony to establish the good character and reputation of Jas. W. Painter. In this assignment of error reference is made to pp. 180 and 182. Upon examination of the record at the designated pages, we find that the objection actually made was to the admissibility of testimony tending to prove the good character and reputation of Captain Thomas S. West, the draftsman of the will, and no mention is there made of Jas. W. Painter, the now deceased witness. For this reason, we think the assignment of error is not well taken.

However, it is not amiss to say that had objection been made to the introduction of evidence to establish the good character and reputation of either the deceased witness or draftsman or both, and a sufficient assignment of error taken thereto, we do not believe the admission of such evidence would have constituted error. *Stephenson* v. *Walker*, 4 Esp. Cas. 50, 170 English Reports (Reprints) p. 638; *Bishop of Durham* v. *Beaumont*, 1 Campb. 207; *Ward* v. *Brown*, 53 W. Va. 227, 44 S. E. 448, and Harrison on Wills, Vol. 1, p. 165.

Appellants further complain that the trial court allowed witnesses on behalf of appellee to give their opinion concerning the mental condition of Miss Magg without their having first testified to sufficient relevant facts disclosing knowledge on which to base such an opinion.

The court was over-liberal in this respect. *McComb* v. *Farrow*, 128 Va. 455, 104 S. E. 812. It permitted numerous witnesses to express opinions upon the mental capacity of testatrix without their having first testified to circumstances justifying the formation or expression of the factual conclusion given. The record, however, discloses that this wide latitude allowed in the admission of this character of testimony was extended all litigants. In numerous instances no objection was made by any party to the questions that elicited such unsupported opinions. Appellants themselves sought and elicited from witnesses their opinion concerning Miss Magg's mental capacity without laying the proper

foundation and are in no position to complain because equal latitude was extended appellee. We find no merit in this claim.

There are several assignments of error made by appellants to the giving of instructions offered by appellee and to the refusal of certain instructions offered by them. To answer all of these objections in detail and at length would unnecessarily prolong this opinion. We deem it sufficient to say that the jury was fully and adequately instructed upon every phase of the case and upon the numerous issues presented. The refusal of additional relevant instructions under such circumstances though they state the law does not constitute reversible error. *Jenkins* v. *Trice, supra.*

The record contains sixty-six assignments of error, though some were withdrawn at bar. In many instances, an alleged error is presented in two or more assignments. All relied upon have been carefully and painstakingly considered, but in no instance do we find any substantial right denied appellants.

The factual aspects of the case were settled by the verdict. Approved as it is by the judgment of the trial court, it may not be disturbed unless plainly wrong or without credible evidenct to sustain it. Section 6363 of the Code, and *Redford* v. *Booker, supra.* We do not find that to be the status of the proof. On the contrary, there is considerable credible testimony and evidenct to sustain the jury's factual finding.

On the whole, it appears that a fair and comprehensive trial was accorded all of the litigants.

The decree of the trial court of November 6, 1948, which establishes the Chumbley will "as the last true will and testament of the said M. S. Tate, deceased," is affirmed.

*Affirmed.*